## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEMETRA BINDER, ANGELA WALDNER, and CHRISTINA CALCAGNO, on behalf of themselves and all others similarly situated, | Case No. |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| vs. | **[DEMAND FOR JURY TRIAL]** |
| SYCAMORE PARTNERS MANAGEMENT L.P., a Delaware Limited Partnership, PREMIUM APPAREL, LLC, a Delaware Limited Liability Corporation, and DOES 1-50, inclusive, | |
| Defendants. | |

Plaintiffs Demetra Binder, Angela Waldner, and Christina Calcagno (collectively, "Plaintiffs") bring this action, on behalf of themselves and all others similarly situated, against Defendant Sycamore Partners Management, L.P. and Defendant Premium Apparel, LLC (collectively, "Defendants"), and state:

### I.    NATURE OF ACTION

1.    Prices reflect a perceived value to consumers.[1] False advertising of prices can be used to manipulate consumers' value perception of products and cause consumers to overpay for them. Aware of the intertwined connection between consumers' buying decision processes and price, retailers like Defendants lure consumers with advertised discounts that promise huge savings and high value. But the promised savings are false and the product's value reflected in its price is incorrect when the retailer inflates its prices due to advertised discounts off of some higher, made-up "original" price that no one ever pays. Defendants have continually advertised false price

---

[1] "[P]rice is materially utilized in the formation of perceptions of the product's value and influences the decision to purchase the product or to continue to search for a lower price." Dhruv Grewal & Larry D. Compeau, *Comparative Price Advertising: Informative or Deceptive?*, 11 J. PUB. POL'Y & MKTG. 52, 55 (1992); "[R]eference to a retailer's normal or regular price in retail sale price advertising provides the consumer with information used to determine perceived value" Patrick J. Kaufmann, N. Craig Smith, & Gwendolyn K. Ortmeyer, *Deception in Retailer High-Low Pricing: A "Rule of Reason" Approach*, 70 J. RETAILING 115, 118 (1994).

discounts for merchandise sold throughout their Ann Taylor Factory Stores and LOFT Outlet stores (hereinafter sometimes referred to collectively as "outlet stores").[2] This class action seeks monetary damages, restitution, and declaratory and injunctive relief from Defendants arising from their deceptive business practice of advertising fictitious "original" prices and corresponding phantom discounts on women's apparel, accessories, shoes, and other items sold in their Ann Taylor Factory Stores and LOFT Outlets.

2.       False reference pricing occurs when a seller fabricates a false "original" price for a product and then offers that product at a substantially lower price under the guise of a discount. The resulting artificial price disparity misleads consumers into believing the product they are buying has a higher market value, and it induces them into purchasing the product. This practice artificially inflates the true market price for these products by raising consumers' internal reference price and in turn the perceived value consumers ascribe to these products (i.e., demand).[3] Consequently, false reference pricing schemes enable retailers, like Defendants, to sell products above their true market price and value—and consumers are left to pay the inflated price. Consumers are thus damaged by not receiving the promised discounts for products advertised with false reference pricing.

---

[2] Plaintiffs are informed and believe and thereon allege that both Ann Taylor Factory Stores and LOFT Outlets are outlet stores that are commonly owned and operated by Defendants.

Ann Taylor was founded in 1954 and sold clothing for professional women in its standalone retail stores. In 1998, the Ann Taylor company launched Ann Taylor Loft as a spinoff brand with separate retail stores to cater to younger professional women. In 2009, Ann Taylor Loft was renamed LOFT. Bethany Biron, *The Rise and Fall of Ann Taylor, the Company that Dressed American Career Women for Decades and Ushered in the Era of the 'Power Suit'*, https://www.businessinsider.com/the-rise-and-fall-of-ann-taylor-photos-history-2020-7 (last accessed April 24, 2023). Both Ann Taylor and LOFT operate outlet stores—Ann Taylor Factory Store and LOFT Outlet, respectively—which are the subject of this Complaint, and not the mainline retail stores.

[3] Dhruv Grewal & Larry D. Compeau, Comparative Price Advertising: Informative or Deceptive?, 11 J. Pub. Pol'y & Mktg. 52, 55 (Spring 1992) ("By creating an impression of savings, the presence of a higher reference price enhances subjects' perceived value and willingness to buy the product.").

3.      The following example of a hypothetical DVD seller, which is parallel to Defendants' deceptive business practice, illustrates the illegal false reference pricing scheme and its attendant harm to consumers. A seller knows it can sell a particular DVD at $5.00, which represents both the market price and the price at which the seller could regularly offer the DVD and make a profit. Instead, however, the seller creates a "original" price for the DVD of $100.00 and advertises the DVD as "on sale" at **90% off** rendering the ***"sale" price*** of the DVD $10.00. When a consumer purchases the DVD, he presumes he got a "good deal" on a DVD previously sold—i.e., valued by others in the market—at an "original" price of $100.00. The consumer's presumption and purchase stem directly from the seller's purposeful deception. For example, if the seller tried to sell that same DVD for $10.00 ***without*** referencing a false original price of $100.00, and the attendant 90% off discount, that seller would not be able to sell any DVDs at $10.00 because the true, original market price of the DVD is $5.00. In contrast, by presenting consumers with a false "original" price of $100.00, consumers will purchase the DVD at $10.00; the seller thus has fabricated an increase in demand for the DVD through the ***perceived value*** of both the DVD itself and the substantial discount of $90.00. Consumers' increased willingness and demand to pay $10.00 for the DVD will in turn impact the overall market price of the DVD. Therefore, the seller can create a false market price for the DVD at $10.00 by advertising a false "original" price and a corresponding phantom discount of 90% off. Plaintiffs' case seeks to remedy this deception, its attendant harm to consumers, and that disparity—the inflated market price through Defendants' application of an illegal discounting scheme compared to the lower, more accurate market price without any false reference pricing.

4.      Through their false and misleading marketing, advertising, and pricing scheme alleged herein, Defendants violated, and continue to violate, New York, New Jersey, California, and federal law. Specifically, Defendants violated and continue to violate: New York Consumer Protection from Deceptive Acts and Practices Act, N.Y. GBL § 349, *et seq.* (the "NYDAPA"); New York False Advertising Act, N.Y. GBL § 350, *et seq.* (the "NYFAA"); New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1, *et seq.* (the "NJCFA"); New Jersey Truth in Consumer Contract,

Warranty and Notice Act, N.J.S.A. § 56:12-14, *et seq.* (the "TCCWNA"); California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* (the "UCL"); California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.* (the "FAL"); California's Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.*; and the Federal Trade Commission Act ("FTCA"), which prohibits "unfair or deceptive acts or practices in or affecting commerce" (15 U.S.C. § 45(a)(1)) and false advertisements (15 U.S.C. § 52(a)).

5.    Plaintiffs bring this action on behalf of themselves and other similarly situated consumers who have purchased one or more apparel items, accessories, and other items at Defendants' outlet stores, Ann Taylor Factory Store and LOFT Outlet, that were deceptively represented as discounted from a false advertised reference price. Plaintiffs seek to halt the dissemination of this false, misleading, and deceptive pricing scheme, to correct the false and misleading perception it has created in the minds of consumers, and to obtain redress for those who have overpaid for merchandise tainted by this deceptive pricing scheme. Plaintiffs also seek to enjoin Defendants from using false and misleading misrepresentations regarding former price comparisons in their labeling and advertising permanently. Further, Plaintiffs seek to obtain damages, restitution, reasonable costs and attorney's fees, and other appropriate relief in the amount by which Defendants were unjustly enriched as a result of their sales of merchandise offered a false discount.

## II.    JURISDICTION AND VENUE

6.    This Court has original jurisdiction of this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and at least some members of the proposed Classes (defined below) have a different citizenship from Defendants.

7.    The Southern District of New York has personal jurisdiction over Defendants because Defendant Sycamore Partners Management, L.P. is a limited partnership or other business entity which does conduct business in the State of New York and its principal executive offices are located in New York, New York; and Defendant Premium Apparel, LLC is a limited liability

company or other business entity which does conduct business in the State of New York and its principal executive offices are located in New York, New York. Defendants conduct sufficient business with sufficient minimum contacts in New York, and/or otherwise intentionally avail themselves to the New York market through the operation of Ann Taylor Factory Stores and LOFT Outlet stores within the State of New York.

8.     Venue is proper under 28 U.S.C. § 1391(b)(2) because Defendants transact substantial business in this District; a substantial part of the events giving rise to Plaintiffs' claims arose in this District; and Defendants' misconduct alleged herein occurred in this District.

### III.    GENERAL ALLEGATIONS

**A.    Retailers Benefit from False Reference Pricing Schemes.**

9.     Defendants engage in a false and misleading reference price scheme in the marketing and selling of their merchandise at their outlet stores.

10.     Retailers, including Defendants, substantially benefit from employing false reference pricing schemes and experience increased sales because consumers use advertised reference prices to make purchase decisions. The information available to consumers varies for different types of products.[4] Nonetheless, consumers frequently lack full information about products and as a result often use information from sellers to make purchase decisions.[5]

11.     Defendants' deceptive advertised reference prices are thus incorporated into consumers' decision process. First, a product's "price is also used as an indicator of product

---

[4] Even within a product, consumers may have imperfect information on the individual attributes. Economists describe "search goods" as those whose attributes "can be ascertained in the search process prior to purchase" (*e.g.*, style of a shirt), "experience goods" as those whose attributes "can be discovered only after purchase as the product is used" (*e.g.*, longevity of a shirt), and "credence goods" as those whose attributes "cannot be evaluated in normal use" (*e.g.*, whether the shirt's cotton was produced using organic farming methods). Darby, Michael R., and Edi Karni. "Free Competition and the Optimal Amount of Fraud." *The Journal of Law and Economics* 16 no. 1 (1973): 67-88, pp. 68-69.

[5] "Not only do consumers lack full information about the prices of goods, but their information is probably even poorer about the quality variation of products simply because the latter information is more difficult to obtain". Nelson, Phillip. "Information and Consumer Behavior." *Journal of Political Economy* 78, no. 2 (1970): 311-29, pp. 311-12.

quality."[6] In other words, consumers view Defendants' deceptive advertised reference prices as a proxy for product quality. Second, reference prices "appeal[] to consumers' desire for bargains or deals."[7] Academic researchers note how consumers "sometimes expend more time and energy to get a discount than seems reasonable given the financial gain involved," and "often derive more satisfaction from finding a sale price than might be expected on the basis of the amount of money they actually save."[8] Under this concept, coined as "transaction utility" by Noble Prize-winning economist Richard Thaler, consumers place some value on the psychological experience of obtaining a product at a perceived bargain.[9]

12.      Research in marketing and economics has long recognized that consumer demand can be influenced by "internal" and "external" reference prices.[10] Internal reference prices are "prices stored in memory" (e.g., a consumer's price expectations adapted from past experience) while external reference prices are "provided by observed stimuli in the purchase environment"

---

[6]  Grewal, Dhruv, and Larry D. Compeau. "Comparative price advertising: Informative or deceptive?" *Journal of Public Policy & Marketing* (1992): 52-62, p. 54. Also see Thaler, Richard. "Mental Accounting and Consumer Choice." *Marketing Science* 4, no. 3 (1985): 199-214, p. 212 ("The [reference price] will be more successful as a reference price the less often the good is purchased. The [reference price] is most likely to serve as a proxy for quality when the consumer has trouble determining quality in other ways (such as by inspection)").

[7]  Grewal, Dhruv, and Larry D. Compeau. "Comparative price advertising: Informative or deceptive?" *Journal of Public Policy & Marketing* (1992): 52-62, p. 52.

[8]  Darke, Peter and Darren Dahl. "Fairness and Discounts: The Subjective Value of a Bargain." *Journal of Consumer Psychology* 13, no 3 (2003): 328-338, p. 328.

[9]  "To incorporate … the psychology of buying into the model, two kinds of utility are postulated: *acquisition utility* and *transaction utility*. The former depends on the value of the good received compared to the outlay, the latter depends solely on the perceived merits of the 'deal'". Thaler, Richard. "Mental Accounting and Consumer Choice." *Marketing Science* 4, no. 3 (1985): 199-214, p. 205.

[10]  Empirical results "suggest that internal reference prices are a significant factor in purchase decisions. The results also add empirical evidence that external reference prices significantly enter the brand-choice decision." Mayhew, Glenn E. and Russell S. Winer. "An Empirical Analysis of Internal and External Reference Prices using Scanner Data." *Journal of Consumer Research* 19, no. 1 (1992): 62-70, p. 68.

(e.g., a "suggested retail price," or other comparative sale price).[11] Researchers report that consumer's internal reference prices adjust toward external reference prices when valuing a product.[12] For infrequently purchased products, external reference prices can be particularly influential because these consumers have little or no prior internal reference.[13] In other words, "[t]he deceptive potential of such advertised reference prices are likely to be considerably higher for buyers with less experience or knowledge of the product and product category."[14] Academic literature further reports that "there is ample evidence that consumers use reference prices in making brand choices"[15] and publications have summarized the empirical data as follows:

> Inflated reference prices can have multiple effects on consumers. They can increase consumers' value perceptions (transaction value and acquisition value), reduce their search intentions for lower prices, increase their purchase intentions, and reduce their purchase intentions for competing products … Inflated and/or false advertised reference prices enhance consumers' internal reference price estimates and, ultimately, increase their perceptions of value and likelihood to purchase[.][16]

---

[11] Mayhew, Glenn E. and Russell S. Winer. "An Empirical Analysis of Internal and External Reference Prices using Scanner Data." *Journal of Consumer Research* 19, no. 1 (1992): 62-70, p. 62.

[12] "Buyers' internal reference prices adapt to the stimuli prices presented in the advertisement. That is, buyers either adjust their internal reference price or accept the advertised reference price to make judgments about the product's value and the value of the deal." Grewal, Dhruv, Kent B. Monroe, and Ramayya Krishnan. "The Effects of Price-Comparison Advertising on Buyers' Perceptions of Acquisition Value, Transaction Value, and Behavioral Intentions." *The Journal of Marketing* 62 (1998): 46-59, p. 48.

[13] As Thalen notes, "the [suggested retail price] will be more successful as a reference price the less often the good is purchased." Thaler, Richard. "Mental Accounting and Consumer Choice." Marketing Science 4, no. 3 (1985): 199-214, p. 212.

[14] Grewal, Dhruv, and Larry D. Compeau. "Pricing and public policy: A research agenda and an overview of the special issue." *Journal of Public Policy & Marketing* 18, no. 1 (1999): 3-10, p. 7.

[15] Kalyanaram, Gurumurthy, and Russell S. Winer. "Empirical Generalizations from Reference Price Research." *Marketing Science* 14, no. 3 (1995): G161-G169, p. G161. *See also* Gotlieb, Jerry B. and Cyndy Thomas Fitzgerald. "An Investigation into the Effects of Advertised Reference Prices on the Price Consumers are Willing to Pay for the Product." *Journal of Applied Business Research* 6, no. 1 (1990): 59-69, at pp. 65-66. ("The results of this research provide support for the position that [external] reference prices are important cues consumers use when making the decision concerning how much they are willing to pay for the product.").

[16] Grewal, Dhruv, and Larry D. Compeau. "Pricing and public policy: A research agenda and an overview of the special issue." *Journal of Public Policy & Marketing* 18, no. 1 (1999): 3-10, p. 7.

13.    Retailers, including Defendants, understand that consumers are susceptible to a perceived bargain, and therefore, they have a substantial financial interest in making consumers believe they are receiving a bargain, even if they are not. Contrary to the illusions of bargains in Defendants' advertisements, consumers are actually overpaying for Defendants' products and not receiving any promised discounts due to the relationship between Defendants' deceptive price comparisons, consumer purchase decisions, and the economic principles of demand and price.

**B.    Defendants' Fraudulent Price Discounting Scheme Violates New York, New Jersey and California State Law, and Federal Regulations.**

14.    Defendants have continually engaged in a false reference pricing scheme injurious to consumers by advertising apparel, accessories, and other items at discounted, "sale" prices. Defendants marketed the "sale" prices as discounts from the "original" prices set forth on the products' price tags for Ann Taylor Factory Store and LOFT Outlet merchandise sold at Defendants' outlet stores. However, the advertised discounts are nothing more than phantom markdowns because (1) the represented "original" prices, *i.e.,* the prices listed on the price tags for the merchandise, are artificially inflated; (2) the products are never offered for sale at the full original price for any substantial period of time, (if at all); and (3) the original prices are never the true market price for the products Defendants sell.

15.    Defendants mark each item with a price tag that sets forth the "original" price at which the item was purportedly offered for sale. That original price is printed on the item's price tag. Defendants then display large sale-discount signage on top of or alongside each rack of clothing or accessories, advertising a "discounted % off," or a discounted whole-price reduction for the item, which is substantially less than the original price listed on the price tag. The products were never sold at the "original" or "price tag" prices. Thus, the advertised reference price is false and used solely to induce consumers into believing that the merchandise was once sold at the reference price and from which the false, "discounted," corresponding sale price is derived.

16.    The percentage-off discounts advertised in Defendants' outlet stores promise to consumers that the if they purchase certain items, then they will receive a specific percentage-off

discount of those items, which are represented as being valued at their higher advertised "original" price. In actuality, the percentage-off discounts are not true discounts as they are applied to an advertised "original" price that was completely fabricated by Defendants and that does not represent a price at which Defendants regularly sold the item in the normal course of business. Consequently, consumers do not receive the discount they were promised by Defendants when they purchase items from Defendants at a purportedly discounted price.

17.    Defendants convey their deceptive pricing scheme to consumers through promotional materials, in-store displays, and print advertisements. For example, in Defendants' outlet stores, the pricing scheme is prominently displayed, advertising deep discounts on various items throughout the store.

18.    Defendants' pricing scheme is intended to increase sales but has the effect of depriving consumers of the benefit of their bargain. The clothing items and attire listed at "regular" or "original" prices were never offered for sale at those prices for a substantial period of time. The original or price tag price is not the price at which Defendants expect to sell their merchandise; it is merely a basis for misleading consumers into believing they are receiving a substantial discount from the false original price.

19.    Defendants sell their own, exclusive, branded products in their Ann Taylor Factory Store and LOFT Outlet stores. Thus, there is no regular or market price for many of the products being sold at their outlet stores other than the price set by Defendants at those stores. Plaintiffs are informed and believe and thereon allege that all made-for-outlet Ann Taylor Factory Store merchandise can be differentiated from mainline retail Ann Taylor merchandise by the inclusion of the word "Factory" on its labels and/or price tags. Likewise, LOFT Outlet merchandise can be differentiated from mainline retail LOFT merchandise by the inclusion of the word "Outlet" on its labels and/or price tags. Plaintiffs are informed and believe and thereon allege that Ann Taylor Factory Stores and LOFT Outlets carry mostly—if not entirely—made-for-outlet merchandise.

20.    There is no meaningful difference between the made-for-outlet merchandise sold by Defendants at the outlet stores in that the same products are sold at every Ann Taylor Factory

Store and LOFT Outlet and the same fraudulent pricing scheme is deployed uniformly. There is no other market for the Ann Taylor Factory Store and LOFT Outlet store clothing other than at the Ann Taylor Factory Store and LOFT Outlet stores. The difference between the "sale" and "regular" prices offered at the outlet stores is a false savings percentage or dollar discount used to lure consumers into purchasing artificially inflated, overpriced products.

21.     Nowhere in Defendants' stores do Defendants disclose that the reference or original prices used are not: 1) former prices; or 2) recent, regularly offered former prices; 3) or prices at which identical products are sold elsewhere in the market. Nor do Defendants disclose any date at which the original prices were offered in the market. The omission of these disclosures, coupled with Defendants' use of fictitious advertised reference prices, renders Defendants' pricing inherently misleading to reasonable consumers, including Plaintiffs.

22.     The advertised reference prices are false and induce consumers into believing that Ann Taylor Factory Store and LOFT Outlet merchandise was once sold at the reference price, in the near term, and will be again if the consumer does not make a purchase at the "bargain" price. Defendants engage in this practice knowing full well that the advertised products are never actually offered or sold at the advertised reference prices.

23.     Furthermore, Defendants advertise the false reference prices to induce consumers into believing that Ann Taylor Factory Store and LOFT Outlet merchandise is worth the inflated, false reference price such that the lower "sale" price represents a limited time discount. Customers, however, do not enjoy any such advertised discount when they purchase items from Defendants' outlet stores.

24.     Defendants advertise constant discounts in their outlet stores for nearly all items they offer for sale, and their employment of perpetual false discounts deprives consumers of a fair opportunity to fully evaluate the offers and to make purchase decisions based on accurate information. Consumers have no way of discerning that Defendants' pricing and discount representations throughout their outlet stores are false and misleading.

25.     Defendants' systematic and pervasive pricing policy and conduct as described herein is in direct violation of federal, California, and New Jersey pricing regulations.

26.     Under California law, for instance, a seller may only discount an item from its own **original price** for up to 90 days; or in the alternative, it may offer a discount from the original price of an item being offered by a competitor, within the relevant market, for up to 90 days.  In either scenario, a seller can only offer a "sale" from an original price for 90 days. At that point, on day 91, the seller has two options: the product must either return to its full original price, or the seller may continue to sell the product at the discounted price, ***as long as it discloses to the consumer the date on which the product was last offered for sale at its alleged former price.*** *See* BUS. & PROF. CODE § 17501. Under California law, a seller cannot use an old, outdated, "original price" as the basis for a sale or discount, unless it discloses to the consumer the date on which the prior original price was offered in the market. *Id.*

27.     Likewise, Defendants' advertised discounts were fictitious under New Jersey pricing regulations because the reference prices did not represent a price at which a substantial number of sales were made in the regular course of business for the same or comparable items during the first or most recent 60 days that the items were offered for sale. *See* N.J.A.C. § 13:45A-9.6(b)(1). Similarly, Defendants' advertised discounts were fictitious because the reference prices did not represent a price at which the same or comparable items were actively and openly offered for sale in the regular course of business during 28 of the most recent 90 days. *See* N.J.A.C. § 13:45A-9.6(b)(2).

28.     Moreover, Defendants' advertised discounts were fictitious because the reference prices did not represent a *bona fide* price at which Defendants previously sold or offered to sell the products, on a regular basis, for a reasonably substantial period of time, as required by the Federal Trade Commission ("FTC"). *See* 16 C.F.R. § 233.1 et seq.

29.     Defendants' perpetual discounting of their outlet merchandise constitutes false, fraudulent, and deceptive advertising because the "original" reference price listed is substantially higher than those prices actually offered by Defendants. The reference prices are a total fiction

used exclusively as a benchmark from which the false discount and corresponding "sale" price is derived. Defendants' scheme has the effect of tricking consumers into believing they are getting a significant deal by purchasing Ann Taylor Factory Store and LOFT Outlet merchandise at a steep discount, when in reality, consumers are overpaying for Ann Taylor Factory Store and LOFT Outlet merchandise. Defendants' deceptive pricing scheme has artificially raised the prices actually paid by consumers by creating the false impression of a bargain.

30.    The process of how Defendants' false reference pricing scheme injures consumers proceeds as follows. Defendants advertised their merchandise with false reference prices, which then caused consumers to be deceived into overvaluing those products. As a result, consumers' demand for the Ann Taylor Factory Store and LOFT Outlet merchandise has artificially increased. This artificial, illusory increase in consumers' demand further resulted in an increase in the price of Defendants' Ann Taylor Factory Store and LOFT Outlet merchandise. This resultant price increase has been reflected in the "discounted sale" price at which consumers, including Plaintiffs, paid for the Ann Taylor Factory Store and LOFT Outlet merchandise. Consumers thus unknowingly purchased the Ann Taylor Factory Store and LOFT Outlet merchandise at inflated prices all caused by Defendants' deceptive false reference pricing scheme. The Ann Taylor Factory Store and LOFT Outlet merchandise is worth less than the inflated prices at which they are offered as a "discount." Without the false reference pricing scheme, the Ann Taylor Factory Store and LOFT Outlet merchandise would *not* command the higher, inflated prices. Consumers like Plaintiffs have therefore overpaid for Ann Taylor Factory Store and LOFT Outlet merchandise— which, to circle back, was caused by Defendants' deception.

31.    Thus, Defendants' scheme intends to and does provide harmful misinformation to customers. This misinformation communicates to consumers, including Plaintiffs, that the products sold in Defendants' stores have a greater value than the advertised discounted price.

C.    **Defendants' Fraudulent Price Discounting Scheme Harms All Consumers**

32.    All consumers are harmed by Defendants' conduct as alleged herein. The impact of Defendants' conduct pervades the entire market for their Ann Taylor Factory Store and LOFT

Outlet merchandise irrespective of individual consumer's beliefs or purchasing decision processes because, as explained below, the artificially increased demand generated by Defendants' false reference pricing scheme results in increased actual sales prices beyond the prices Defendants could command in the absence of the false reference pricing scheme. Accordingly, consumers' subjective beliefs about the value of Ann Taylor Factory Store and LOFT Outlet merchandise are inconsequential to the injury they face when purchasing said merchandise. To be harmed by Defendants, it matters not whether consumers believe they will receive a discount on Ann Taylor Factory Store and LOFT Outlet merchandise when they purchase it, nor does it matter why consumers purchased Ann Taylor Factory Store and LOFT Outlet merchandise. Likewise, consumers need not have any certain perceptions about Defendants' pricing nor need they any insight into the true market prices for apparel, accessories, and other related items to have been harmed by Defendants' false discount pricing scheme.

33.     When consumers purchase Ann Taylor Factory Store and LOFT Outlet products, they will all overpay and they will all not receive the benefit of the promised discounts. The process of how Defendants' false reference pricing scheme injures consumers demonstrates how all consumers are harmed. In short, Defendants' false reference pricing causes an illusory, artificial increase in the demand and attendant price for Ann Taylor Factory Store and LOFT Outlet merchandise resulting in all consumers, including Plaintiffs, having no choice but to overpay for said merchandise at the resultant inflated prices. When consumers like Plaintiffs now purchase Ann Taylor Factory Store and LOFT Outlet merchandise, the merchandise is worth less than the inflated price at which it is purchased.

34.     A product's reference price matters to consumers because it serves as a baseline upon which consumers perceive a product's value.[17] Empirical studies thus "suggest that consumers are likely to be misled into a willingness to pay a higher price for a product simply

_____

[17] Thaler, Richard, "Mental Accounting and Consumer Choice," *Marketing Science* 4, no. 3 (1985): 199-214, at p. 212.

because the product has a higher reference price."[18] As to Defendants' products, consumers are misled and incorrectly overvalue them due to Defendants' false price comparisons. The price at which consumers purchase Defendants' products reflects consumers' overvaluation of the products as Defendants can get away with commanding an inflated price due to this overvaluation. Academic researchers have documented this relationship between reference prices, and consumers' attendant behaviors and the harm inflicted on them by deceptive retailers as follows:

> [A]dvertised reference prices in these deal-oriented advertisements can enhance buyers' internal reference prices . . . . These enhanced internal reference prices, when compared with the lower selling price, result in higher transaction value perceptions. The increase in perceived transaction value enhances purchases and reduces search behavior for lower prices. If sellers intentionally increase the advertised reference prices above normal retail prices, this is, inflate advertised reference prices, the resulting inflated perceptions of transaction value would be deceptive. Harm to both buyers and competitors could result from the effect of the inflated transaction value on buyers' search and purchase behaviors.[19]

35.    To further explain, the false pricing information in Defendants' advertisements, in-store displays, and promotional materials first caused consumers to perceive they were receiving a bargain on Ann Taylor Factory Store and LOFT Outlet merchandise when purchased at its "sale" price. This consumer perception resulted in these consumers gaining an additional "transaction value"[20] for their Ann Taylor Factory Store and LOFT Outlet purchases, which they would not

---

[18] Gotlieb, Jerry B. and Cyndy Thomas Fitzgerald. "An Investigation into the Effects of Advertised Reference Prices on the Price Consumers are Willing to Pay for the Product." *Journal of Applied Business Research* 6, no. 1 (1990): 59-69, at p. 66. Moreover, "if a higher reference price encourages consumers to pay a higher price for a product than the consumer was willing to pay for the identical product with a lower reference price, then the practice of using high reference prices would be deceptive." *Id*. at p. 60.

[19] Grewal, Dhruv, Kent B. Monroe, and Ramayya Krishnan. "The Effects of Price-Comparison Advertising on Buyers' Perceptions of Acquisition Value, Transaction Value, and Behavioral Intentions." *The Journal of Marketing* 62 (1998): 46-59, at p.46.

[20] "To incorporate … the psychology of buying into the model, two kinds of utility are postulated: acquisition utility and transaction utility. The former depends on the value of the good received compared to the outlay, the latter depends solely on the perceived merits of the 'deal'." Thaler, Richard. "Mental Accounting and Consumer Choice." Marketing Science 4, no. 3 (1985): 199-214, p. 205; Dhruv Grewal & Larry D. Compeau, Comparative Price Advertising: Informative or Deceptive?, 11 J. Pub. Pol'y & Mktg. 52, 55 (Spring 1992) ("By creating an impression of savings, the presence of a higher reference price enhances subjects' perceived value and willingness to buy

have otherwise gained absent Defendants' false reference pricing scheme. Consumers' valuation of Ann Taylor Factory Store and LOFT Outlet merchandise thus increased. This increase in consumers' perceived valuation of Ann Taylor Factory Store and LOFT Outlet merchandise then caused an artificial increase in the aggregate demand of said merchandise. This artificial increase in the aggregate demand then caused an attendant increase in the price of Ann Taylor Factory Store and LOFT Outlet merchandise. Defendants' false reference pricing scheme has thus disrupted the natural market for their Ann Taylor Factory Store and LOFT Outlet merchandise, and Defendants have been able to charge all consumers inflated prices, as reflected in both the "sale" and "original" prices. Everyone is now forced to pay above-market prices for Ann Taylor Factory Store and LOFT Outlet merchandise should they decide to make a purchase at any of Defendants' retail or outlet stores. All consumers will thus pay an inflated price for Ann Taylor Factory Store and LOFT Outlet products regardless of the reason for their purchase.

36.    Fundamental economics concepts and principles provide a foundation upon which the uniform harm of Defendants' false reference pricing scheme is based. One such principle is that cost and demand conditions determine market prices all consumers pay for products.[21] The aggregate demand curve for a product, including those sold by Defendants, represents consumers' valuation of the product, and as consumers' valuation increases, the demand curve shifts outward. When the aggregate demand curve of a product shifts outward, the market price for the product will increase. Specific individual's willingness to pay for a product will not negate how market prices, as determined by aggregate demand, dictate what all consumers purchasing a given product will pay.

---

the product."); Grewal, Dhruv, and Larry D. Compeau. "Pricing and public policy: A research agenda and an overview of the special issue." Journal of Public Policy & Marketing 18, no. 1 (1999): 3-10, p. 7.

[21] "[P]rice and quantity are determined by all buyers and sellers as they interact in the marketplace" (Mankiw, N. *Essentials of Economics.* Eighth Edition. Boston, MA: Cengage Learning, 2015, at p. 66). *See also,* Varian, Hal R. *Microeconomics Analysis.* Third Edition. New York, NY: W. W. Norton & Company, 1992, at pp. 23-38, 144-157, 233-353, and 285-312.

37.    Therefore, Defendants' conduct alleged herein has impacted the market prices of their Ann Taylor Factory Store and LOFT Outlet products, and any one individual consumer's subjective beliefs or idiosyncratic rationales will not isolate them from the resultant inflation in Ann Taylor Factory Store and LOFT Outlet prices. Economic theory ensures that as the aggregate demand curve for Ann Taylor Factory Store and LOFT Outlet merchandise moved outward, all consumers must pay a higher price for Ann Taylor Factory Store and LOFT Outlet products than they would have paid absent Defendants' false reference pricing scheme. Plaintiffs and members of the proposed Classes thus suffered a common impact from Defendants' ability to sell Ann Taylor Factory Store and LOFT Outlet merchandise at inflated prices and it was Defendants who caused the inflation and chose to sell their Ann Taylor Factory Store and LOFT Outlet products at the inflated prices—and who continue to sell Ann Taylor Factory Store and LOFT Outlet products at inflated prices to the detriment of all purchasers.

D.    **Investigation**

38.    Plaintiffs' counsel has conducted a large-scale, comprehensive investigation into the Defendants' pricing practice. Plaintiffs' counsel first tracked items in Defendants' outlet stores beginning in October of 2021 and concluding in September of 2022. Every product in Defendants' outlet stores remained on sale for the duration of this tracking period, discounted against a false reference price. As part of the 2021–2022 investigation, Plaintiffs' investigators observed Ann Taylor Factory Store and LOFT Outlet stores throughout California, New Jersey, and New York. The prices on Defendants' products were uniform at every location. *See* **Exhibit A**, list of exemplar products from 2021–2022 investigation.

39.    Plaintiffs' counsel's investigation revealed that the "original" or "price tag" price of the items Plaintiffs purchased was never the true market price at Ann Taylor Factory Store and LOFT Outlet outlet stores preceding Plaintiffs' purchases. Instead, Defendants continuously offered the items for sale at the falsely "discounted" prices, including those products purchased by Plaintiffs. Plaintiffs' counsel's investigation revealed that this was a pervasive practice at the Ann Taylor Factory Store and LOFT Outlet stores, as hundreds of items remained continuously

discounted from their "original" or "price tag" price and they were not offered for sale at their original price. Defendants engage in a systematic scheme to continuously "discount" their merchandise without ever offering the merchandise for sale at their "original" or "price tag" prices.

40.    As far back as October 02, 2021, all types of blouses and tops were offered at a discount that compared a regular price ($64.99, $59.99, $49.99) to a percentage-off discount ("40% off") in Defendants' outlet stores, Ann Taylor Factory Store and LOFT Outlet. *See* **Exhibit A**. Likewise, as far back as October 2, 2021, all types of pants were offered at a discount that compared a regular price ($74.99, $79.99, $98.99, $98.88) to a percentage-off discount ("25% off" or $40% off"). *See* **Exhibit A**. Other items still were offered at a discount that compared a regular price to a "sale" price, including shorts that were advertised with a regular price of $49.99 and a "sale" price of $24.99 on both October 2, 2021, and September 14, 2022, in Defendants' outlet stores. *See* **Exhibit A**.

41.    To reiterate, Plaintiffs' investigation of Defendants' outlet stores revealed that their merchandise is priced uniformly. That is, merchandise sold at Defendants' stores bears a price tag with a false original price and a substantially discounted "_____% Off," sale price. Plaintiffs' counsel's investigation confirmed that the merchandise purchased by Plaintiffs was priced with a false reference price and a corresponding discounted price, which was in fact an inflated price.

42.    Plaintiffs' counsel's investigators were tracking the pricing of merchandise offered for sale at Ann Taylor Factory Store and LOFT Outlet stores beginning in October 2021. The investigation revealed that items listed for sale in the Ann Taylor Factory Store and LOFT Outlet stores were never offered for sale at their full "original" price. Plaintiffs' counsel's investigators visited Ann Taylor Factory Store and LOFT Outlet stores in New York, New Jersey, and California nearly every day to verify the prices being offered on the Ann Taylor Factory Store and LOFT Outlet merchandise. The pricing scheme was uniform and identical across all stores visited in New York, New Jersey, and California. The only thing that changed was the requisite % off on certain merchandise items.

43.     Therefore, the "original" prices on the merchandise sold at the Ann Taylor Factory Store and LOFT Outlet stores are either false original prices or severely outdated prices that have never been offered in the relevant market.

44.     Despite Plaintiffs' counsel's best efforts at investigation, the full extent of Defendants' false and deceptive pricing scheme can only be revealed through a full examination of records exclusively in the possession of Defendants.

## IV.    PARTIES

### Plaintiffs

45.     Demetra Binder resides in New Jersey. On May 7, 2022, Plaintiff Binder went shopping for some new clothes at the Ann Taylor Factory Store and the LOFT Outlet both located at 651 Kapkowski Road, Elizabeth, New Jersey 07201 (the "Mills Outlet"). In reliance on Defendants' false and deceptive advertising, marketing and discount pricing scheme, Plaintiff Binder purchased the following items from the Mills Outlet on May 7, 2022:

| No. | Item: | Store: | False Reference Price: | Purchase Price: |
|-----|-------|--------|------------------------|-----------------|
| 1 | M Sweaters 33049113 | Ann Taylor Factory Store | $79.99 | $39.99 |
| 2 | M Sweaters 33052694 | Ann Taylor Factory Store | $79.99 | $39.99 |
| 3 | Accessories 32846782 | Ann Taylor Factory Store | $26.99 | $18.89 |
| 4 | M Dresses 33121314 | LOFT Outlet | $84.99 | $59.49 |
| 5 | M Knits 22142108 | LOFT Outlet | $22.99 | $11.49 |
| 6 | M Knits 32655223 | LOFT Outlet | $22.99 | $11.50 |

46.     Plaintiff Binder examined several items at the Mills Outlet before deciding on what items to purchase. After reviewing the advertised sale prices for the six items listed above, Plaintiff Binder examined the items further and picked out sizes that she knew would fit. During her time at the Mills Outlet on May 7, 2022, Plaintiff Binder noticed numerous signs within the both the Ann Taylor Factory Store and LOFT Outlet advertising "25%, 40% and 50% Off" discounts on various items throughout the store.

47.     After observing the original prices of the items and the accompanying sale prices, Plaintiff Binder believed she was receiving a significant discount on the items she had chosen.

Because she liked the items, felt that the discounted price would likely not last, and believed she was getting a significant bargain on the merchandise, she proceeded to the register and purchased the products. The discounts were a material representation to Plaintiff Binder, and she relied upon them in making her purchase decision. She paid a total of $98.87 for the products she purchased at the Ann Taylor Factory Store; and she paid a total of $82.48 for the products she purchased at the LOFT Outlet. However, Plaintiff Binder did not receive the benefit of her bargain at either store.

48.    Plaintiff Binder would not have made her purchases without the misrepresentations made by Defendants. As a result, Plaintiff Binder has suffered economic injury as a direct result of Defendants' unlawful, unfair, and fraudulent conduct.

49.    Angela Waldner resides in River Vale, New Jersey. On or around August 29, 2022, Plaintiff Waldner went shopping for some new clothes at the LOFT Outlet located at 280 Red Apple Court, Central Valley, New York 10917 (the "Woodbury Commons Outlet"). In reliance on Defendants' false and deceptive advertising, marketing and discount pricing scheme, Plaintiff Waldner purchased the following item from the Woodbury Commons Outlet in New York on or around August 29, 2022:

| No. | Item: | Store: | False Reference Price: | Purchase Price: |
|-----|-------|--------|------------------------|-----------------|
| 1 | M Pants 33663609 | LOFT Outlet | $74.99 | $56.24 |

50.    Plaintiff Waldner examined several items at the Woodbury Commons Outlet before deciding on what item to purchase. After reviewing the advertised sale prices for the pants listed above, Plaintiff Waldner examined the item further and picked out size that she knew would fit. During her time at the Woodbury Commons Outlet on or around August 29, 2022, Plaintiff Waldner noticed numerous signs within the LOFT Outlet advertising "25%, 40% and 50% Off" discounts on various items throughout the store.

51.    After observing the original price of the pants and the accompanying sale prices, Plaintiff Waldner believed she was receiving a significant discount on the pants she had chosen.

Because she liked the pants, felt that the discounted price would likely not last, and believed she was getting a significant bargain on the merchandise, she proceeded to the register and purchased the product. The discount was a material representation to Plaintiff Waldner, and she relied upon it in making her purchase decision. She paid a total of $58.56 for the pants she purchased at the Loft Outlet store. However, Plaintiff Waldner did not receive the benefit of her bargain.

52. Plaintiff Waldner would not have made her purchase without the misrepresentations made by Defendants. As a result, Plaintiff Waldner has suffered economic injury as a direct result of Defendants' unlawful, unfair, and fraudulent conduct.

53. Christina Calcagno resides in San Diego County, California. On January 18, 2022, Plaintiff Calcagno went shopping for some new clothes at the Ann Taylor Factory Store located at 4155 Camino De La Plaza, Space #426, San Diego, California 92173-5934 (the "Las Americas Outlet"). In reliance on Defendant's false and deceptive advertising, marketing and discount pricing scheme, Plaintiff Calcagno purchased the following item from the Las America Outlet on January 18, 2022:

| No. | Item: | Store: | False Reference Price: | Purchase Price: |
|-----|-------|--------|------------------------|-----------------|
| 1 | M Knits 32509076 | Ann Taylor Factory Store | $54.99 | $32.99 |

54. Plaintiff Calcagno examined several items at the Las Americas Outlet before deciding on what item to purchase. After reviewing the advertised sale prices for the item listed above, Plaintiff Calcagno examined the item further and picked out size that she knew would fit. During her time at the Las Americas Outlet on January 18, 2022, Plaintiff Calcagno noticed numerous signs within the Ann Taylor Factory Store advertising "25%, 40% and 50% Off" discounts on various items throughout the store.

55. After observing the original prices of the item and the accompanying sale price, Plaintiff Calcagno believed she was receiving a significant discount on the item she had chosen. Because she liked the item, felt that the discounted price would likely not last, and believed she was getting a significant bargain on the merchandise, she proceeded to the register and purchased

the product. The discount was a material representation to Plaintiff Calcagno, and she relied upon them in making her purchase decision. She paid a total of $35.55 (including county, district, and state tax) for the product she purchased at the Ann Taylor Factory Store. However, Plaintiff Calcagno did not receive the benefit of her bargain.

56.    Plaintiff Calcagno would not have made her purchase without the misrepresentations made by Defendants. As a result, Plaintiff Calcagno has suffered economic injury as a direct result of Defendants' unlawful, unfair, and fraudulent conduct.

**Plaintiffs' Damages**

57.    Plaintiffs have been injured and incurred quantifiable actual damages as a result of Defendants' fraudulent pricing scheme, which can be and have been preliminarily calculated through the use of regression analysis.

58.    Plaintiffs each overpaid for the products they purchased as described herein. And it was Defendants' false reference pricing scheme and attendant deception that caused Plaintiffs to overpay. Despite Plaintiffs' original beliefs that the products they purchased were discounted and thus that their value was significantly greater than the sale price for which they purchased them, Plaintiffs in actuality paid an *inflated* price for the products they purchased.

59.    As for Plaintiff Binder, each of the following prices were inflated for the items she purchased: (1) $79.99 ("original" price) and $39.99 (sale price) for the two "M Sweaters" items; (2) $26.99 ("original" price) and $18.89 (sale price) for the No. 3 "Accessories" item; (3) $84.99 ("original" price) and $59.49 (sale price) for the No. 4 "M Dresses" item; and (4) $22.99 ("original" price) and $11.49 and $11.50 (sale prices) for the two "M Knits" items. The items Plaintiff Binder purchased were all worth less than the amount at which Plaintiff Binder paid for each of them. If Defendants had not employed the falsely advertised "original" prices for the six items Plaintiff Binder purchased, then those six items would not have commanded such high, inflated prices.

60.    As for Plaintiff Waldner, the "original" price of $74.99 and the sale price of $56.24 were both inflated for the "M Pants" she purchased. The "M Pants" were worth less than the

amount at which Plaintiff Waldner paid for the item. If Defendants had not employed the falsely advertised "original" price for the pants Plaintiff Waldner purchased, then said item would not have commanded such a high, inflated price.

61.     As for Plaintiff Calcagno, the "original" price of $54.99 and the sale price of $32.99 for the "M Knits" item she purchased were both inflated. The item she purchased was worth less than the amount at which Plaintiff Calcagno paid for it. If Defendants had not employed the falsely advertised "original" price for the item Plaintiff Calcagno purchased, then that item would not have commanded such a high, inflated price.

62.     Plaintiffs were all damaged in their purchases because Defendants' false reference price discounting scheme inflated the final selling price of the items they purchased, such that Defendants' false reference price discounting scheme caused Plaintiffs to pay a price premium. Defendants' false reference price discounting scheme artificially inflated aggregate consumer demand, such that each consumer who purchased the corresponding products paid higher prices when compared to what they would have paid had Defendants not engaged in a false reference pricing scheme. Plaintiffs would not have purchased the merchandise, or would have paid less for it, but for Defendants' representations regarding the false reference prices and purported discounts of the merchandise. Plaintiffs were misled into believing that they were receiving substantial savings on the purchases of Defendants' products which was implied by the falsely advertised reference prices.

63.     In this specific case, for purposes of its investigation and determining a preliminary measure of damages, Plaintiffs, with the assistance of qualified expert economists and consultants, conducted an analysis of Defendants' product SKUs on its website and its pricing practices attached to each SKU. Plaintiffs, through the use of a sophisticated regression analysis, were able to determine the objective measure by which Plaintiffs, and members of the proposed Classes similarly situated, overpaid for the goods they purchased.

64.     Plaintiffs' experts used the data collected during the investigation to analyse 122 products offered for sale within Defendants' stores during the class periods. The average selling

price within this data sample was $45.63, whereas the average reference price was $81.66. Thus, on average, the reference price chosen by Defendants was $36.03 higher (or 79.0% higher) than the selling price.

65.    Plaintiffs' experts used this data to perform two regression models which allowed them to calculate the price premium paid by Plaintiffs and all similarly situated proposed Class members for each product purchased. The first model provides a simple regression analysis to statistically estimate the relationship between selling price and reference price, and finds a regression coefficient of 0.7156, meaning that an incremental $1 increase in the reference price is correlated with an approximately $0.72 increase in the selling price of the item. The second model adds additional control variables for specific product characteristics (e.g., pants vs shorts vs leggings, etc.) and finds a regression coefficient of 0.7299. In other words, the data analysis collectively suggests that increasing the reference price by $1 results in an increase of at least approximately $0.72 in the selling price of items at Ann Taylor.

66.    The measured relationship between Defendants' reference price and selling price can be converted to an estimated overcharge using the previously described differential between the Defendants' reference price and the selling price. For example, as previously discussed, the preliminary data suggests that Defendants' reference prices were $36.03 higher (or 79.0% higher) than the selling price, on average. When combined with the preliminary regression results described above, this $36.03 differential implies that selling prices were $25.78 higher, on average,[22] due to the alleged misconduct in this case. This average overcharge of $25.78 represents approximately 56.5% of the average purchase price within the data collected by Plaintiffs. These results will be revised upon receipt of documents and data during discovery but the data suggests that Plaintiffs and all others similarly situated paid a price premium as a result of the alleged misconduct.

---

[22] $36.03 x 0.7156 = $25.78.

67.    Plaintiffs are susceptible to this reoccurring harm because they cannot be certain that Defendants have corrected this deceptive pricing scheme and they desire to shop at Defendants' stores in the future. Plaintiffs would like to shop at the Ann Taylor Factory Store and LOFT Outlet stores in the future because they offer new clothing items during different seasons. The Ann Taylor Factory Store and LOFT Outlet stores offer apparel for sale in various different sizes for women. The Ann Taylor Factory Store and LOFT Outlet stores also offer seasonal apparel items that are only offered during certain times of the year, and they often offer new merchandise for sale that Defendants have not sold before. Due to the enormous variety of styles and sizes of merchandise offered at Ann Taylor Factory Store and LOFT Outlet stores, Plaintiffs will be unable to parse what prices are inflated and untrue, and what prices are not.

68.    Plaintiffs would like to purchase different Ann Taylor Factory Store and LOFT Outlet apparel items in the future other than the items they purchased as described herein; however, Plaintiffs do not know if Defendants will accurately or inaccurately represent the true prices for the distinct apparel items they would like to buy in the future. Plaintiffs are not knowledgeable about Defendants' pricing practices with regards to their apparel items that have not yet been offered for sale at Defendants' Ann Taylor Factory Store and LOFT Outlet stores. Therefore, Plaintiffs cannot be certain of the veracity or falsity of Defendants' advertised bargains for the wide selection of apparel and other products offered at Defendants' outlet stores. Plaintiffs may again purchase a falsely discounted product at one of the Ann Taylor Factory Store and/or LOFT Outlet stores under the reasonable impression that the advertised reference price represented a *bona fide* former price at which the item was previously offered for sale by Defendants.

69.    Objective measures demonstrate that Plaintiffs overpaid for the Ann Taylor Factory Store and LOFT Outlet merchandise they purchased. The difference between the sale price paid by Plaintiffs due to the artificially increased demand for the products—caused by Defendants' false reference pricing scheme—and the market sale price that the products would have commanded without Defendants' deception provides an objective measure by which Plaintiffs were overcharged and injured by Defendants. The amount of inflation of the prices for the Ann

Taylor Factory Store and LOFT Outlet merchandise Plaintiffs purchased caused by Defendants'
deception thus measures how much Plaintiffs overpaid. As shown above, this amount can be
quantified using regression analysis based on Defendants' historic pricing data.

### **Defendants**

70.     Plaintiffs are informed and believe, and upon such information and belief allege,
Defendant Sycamore Partners Management, L.P., is a Delaware Limited Partnership with its
principal executive offices in New York, New York. Plaintiffs are informed and believe that
Sycamore Partners Management, L.P. owns and operates Ann Taylor Factory Store and LOFT
Outlet stores in New York, New Jersey, and California, and advertises, markets, distributes, and/or
sells clothing and accessories in New York, New Jersey, and California, and throughout the United
States.

71.     Plaintiffs are informed and believe, and upon such information and belief allege,
Defendant Premium Apparel, LLC is a Delaware limited liability corporation with its principal
executive offices in New York, New York. Plaintiff are informed and believe that Defendant
Premium Apparel, LLC is a wholly owned subsidiary of Sycamore Partners Management, L.P.,
and that Premium Apparel, LLC manages the Ann Taylor Factory Store and LOFT Outlet brands.

72.     Plaintiffs do not know the true names or capacities of the persons or entities sued
herein as Does 1-50, inclusive, and therefore sues such defendants by such fictitious names.
Plaintiffs are informed and believe, and upon such information and belief allege, that each of the
Doe defendants is, in some manner, legally responsible for the damages suffered by Plaintiffs and
members of the proposed the Classes as alleged herein. Plaintiffs will amend this Complaint to set
forth the true names and capacities of these defendants when they have been ascertained, along
with appropriate charging allegations, as may be necessary.

73.     Defendants know that their reference price advertising is false, deceptive,
misleading, unconscionable, and unlawful under New York, New Jersey, California and federal
law.

74.    Defendants fraudulently concealed from and intentionally failed to disclose to Plaintiffs and other members of the proposed Classes the truth about their advertised discount prices and former reference prices. Defendants concealed from consumers the true nature and quality of the products sold at their outlet stores.

75.    Defendants intentionally concealed and failed to disclose material facts regarding the truth about false former price advertising in order to provoke Plaintiffs and the proposed Classes to purchase Ann Taylor Factory Store and LOFT Outlet products in their outlet stores.

76.    At all relevant times, Defendants have been under a duty to Plaintiffs and the Classes to disclose the truth about their false discounts.

77.    Plaintiffs each reasonably relied upon Defendants' artificially inflated reference prices and false discounts when purchasing the items described herein at Defendants' Ann Taylor Factory Store and LOFT Outlet stores. Plaintiffs each would not have made such purchases but for Defendants' representations of fabricated "original" prices and false discounts being offered on the merchandise they purchased.

78.    Plaintiffs and the Classes reasonably and justifiably acted and relied on the substantial price differences that Defendants advertised, and made purchases believing that they were receiving a substantial discount on items of greater value than their actual value. Plaintiffs, like other Class members, were lured in, relied on, and were damaged by the deceptive pricing scheme that Defendants carried out.

## IV.    CLASS ALLEGATIONS

79.    Plaintiffs bring this action on behalf of themselves and all other similarly situated Class members pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seek certification of the following Classes against Defendants:

<u>**New York Class**</u>

All persons, within the State of New York, who, within the applicable statutory period (the "Class Period"), purchased from a Ann Taylor Factory Store or LOFT Outlet one or more products at discounts from an advertised reference price and who have not received a refund or credit for their purchase(s).

**New Jersey Class**

All persons, within the State of New Jersey, who, within the applicable statutory period (the "Class Period"), purchased from a Ann Taylor Factory Store or LOFT Outlet, one or more products at discounts from an advertised reference price and who have not received a refund or credit for their purchase(s).

**California Class**

All persons, within the State of California, who, within the applicable statute of limitations preceding the filing of this action (the "Class Period"), purchased from an Ann Taylor Factory Store or LOFT Outlet one or more products at discounts from an advertised reference price and who have not received a refund or credit for their purchase(s).

Excluded from the Classes are Defendants, as well as their officers, employees, agents or affiliates, parent companies and/or subsidiaries, and each of their respective officers, employees, agents or affiliates, and any judge who presides over this action. Plaintiffs reserve the right to expand, limit, modify, or amend these Class definitions, including the addition of one or more Classes, in connection with their motion for Class certification, or at any other time, based upon, *inter alia*, changing circumstances and/or new facts obtained during discovery.

80.     ***Numerosity***: The Class members are so numerous that joinder of all members is impracticable. Plaintiffs are informed and believe that the proposed Classes contain hundreds of thousands of individuals who have been damaged by Defendants' conduct as alleged herein. The precise number of Class members is unknown to Plaintiffs.

81.     ***Existence and Predominance of Common Questions of Law and Fact***: This action involves common questions of law and fact, which predominate over any questions affecting individual Class members. These common legal and factual questions include, but are not limited to, the following:

        a.     whether, during the Class Periods, Defendants used false advertised reference prices on their Ann Taylor Factory Store and/or LOFT Outlet product labels and falsely advertised price discounts on merchandise sold in their retail and outlet stores;

b.    whether Defendants ever offered items for sale or sold items at their advertised reference price;

c.    whether, during the Class Periods, the original price advertised by Defendants was the prevailing market price for the products in question during the three months preceding the dissemination and/or publication of the advertised former prices;

d.    whether Defendants' purported sale prices advertised in their outlet stores reflected any actual discounts or savings;

e.    whether Defendants' purported percentage-off discounts advertised in their outlet stores reflected any actual discounts or savings;

f.    whether Defendants' alleged conduct constitutes violations of the laws asserted;

g.    whether Defendants' alleged conduct constitutes violations of federal and/or New Jersey pricing regulations;

h.    whether Defendants engaged in an unconscionable commercial practice, and/or employed deception or misrepresentation under the laws asserted;

i.    whether Plaintiffs and Class members are entitled to damages and the proper measure of that loss; and

j.    whether an injunction is necessary to prevent Defendants from continuing to use false, misleading or illegal price comparison.

82.    *Typicality*: Plaintiffs' claims are typical of the claims of the Class members because, *inter alia*, all Class members have been deceived (or were likely to be deceived) by Defendants' false and deceptive price advertising scheme, as alleged herein. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all Class members.

83.    *Adequacy*: Plaintiffs will fairly and adequately protect the interests of the Class members. Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no antagonistic or adverse interest to those of the Classes.

84.    *Superiority*: The nature of this action and the nature of laws available to Plaintiffs and the Classes make the use of the class action format a particularly efficient and appropriate procedure to afford relief to them and the Classes for the wrongs alleged. The damages or other financial detriment suffered by individual Class members is relatively modest compared to the burden and expense that would be entailed by individual litigation of their claims against Defendants. It would thus be virtually impossible for Plaintiffs and Class members, on an individual basis, to obtain effective redress for the wrongs done to them. Absent the class action, Class members and the general public would not likely recover, or would not likely have the chance to recover, damages or restitution, and Defendants will be permitted to retain the proceeds of their fraudulent and deceptive misdeeds.

85.    All Class members, including Plaintiffs, were exposed to one or more of Defendants' misrepresentations or omissions of material fact claiming that former reference prices advertised prices were legitimate. Due to the scope and extent of Defendants' consistent false sale prices, advertising scheme, disseminated in a years-long campaign to New York, New Jersey, and California consumers, it can be reasonably inferred that such misrepresentations or omissions of material fact were uniformly made to all members of the Classes. In addition, it can be reasonably presumed that all Class members, including Plaintiffs, affirmatively acted in response to the representations contained in Defendants' false advertising scheme when purchasing merchandise sold at Ann Taylor Factory Store and LOFT Outlet stores.

86.    Plaintiffs are informed that Defendants keep extensive computerized records of their Ann Taylor Factory Store and LOFT Outlet customers through, *inter alia*, customer loyalty programs and general marketing programs. Defendants have one or more databases through which a significant majority of Class members may be identified and ascertained, and they maintain contact information, including email and home addresses, through which notice of this action could be disseminated in accordance with due process requirements.

## V.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Violation of New York Consumer Protection from Deceptive Acts and Practices Act**
**("NYDAPA")**
**N.Y. GBL § 349,** *et seq.*
*(On Behalf of Plaintiff Waldner and the New York Class)*

87.    Plaintiff Waldner repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

88.    Plaintiff Waldner brings this claim individually and on behalf of the members of the proposed New York Class against Defendants for violations of NYDAPA, N.Y. GEN. BUS. LAW § 349.

89.    NYDAPA makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. GEN. BUS. LAW § 349. Defendants' conduct, as set forth herein, constitutes deceptive acts or practices under this section.

90.    Plaintiff Waldner and members of the proposed New York Class are "persons" under NYDAPA, N.Y. GEN. BUS. LAW § 349(h), and Defendants' actions as set forth herein occurred in the conduct of "business, trade or commerce" under NYDAPA.

91.    In the course of their businesses, Defendants advertised false reference prices that gave consumers, including Plaintiff Waldner and members of the proposed New York Class, the impression that their products were regularly sold on the market for a substantially higher price than they actually were; therefore, leading to the false impression that the products sold at Defendants' Ann Taylor Factory Store and LOFT Outlet stores were worth more than they actually were.

92.    Plaintiff Waldner and members of the proposed New York Class had no way of discerning that Defendants' representations were false and misleading.

93.    Defendants thus violated and continue to violate NYDAPA by making statements that, when considered as a whole from the perspective of a reasonable consumer, give the false

impression that the products sold at Defendants' Ann Taylor Factory Store and LOFT Outlet stores are worth more than they actually are.

94.    Defendants knew or should have known that their conduct violated NYDAPA and owed a duty to Plaintiff Waldner and members of the proposed New York Class to refrain from engaging in deceptive acts or practices, and to disclose the truth about their false discounts.

95.    Defendants intentionally and knowingly made affirmative misrepresentations and failed to disclose material facts regarding the prices of their women's apparel and retail products with intent to mislead Plaintiff Waldner and members of the proposed New York Class.

96.    Defendants' misleading and false advertisements were material to Plaintiff Waldner and members of the proposed New York Class, as they relate to the price of the product the consumer is receiving and paying for. A reasonable consumer would attach importance to such representations and would be induced to act thereon in deciding whether or not to purchase the product.

97.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff Waldner and members of the proposed New York Class, about the price of their women's apparel and retail products. Plaintiff Waldner and members of the proposed New York Class reasonably relied upon Defendants' artificially inflated reference prices and false discounts when purchasing the women's apparel and retail products from Defendants' Ann Taylor Factory Store and LOFT Outlet stores. Plaintiff Waldner and members of the proposed New York Class would not have made such purchases but for Defendants' representations regarding the substantial discount being offered for the products.

98.    Defendants' violation of NYDAPA, through their unlawful, unfair, and fraudulent business practices, are ongoing and present a continuing threat that Plaintiff Waldner, members of the proposed New York Class, and the public will be deceived into purchasing products based on price comparisons of arbitrary and inflated "reference" prices and substantially discounted "sale" prices. These false comparisons created phantom markdowns and lead to financial damage for consumers like Plaintiff Waldner and members of the proposed New York Class.

99.     As a direct and proximate result of Defendants' misleading and false advertisements, as well as Defendants' deceptive and unfair acts and practices made during the course of Defendants' businesses, Plaintiff Waldner and members of the proposed New York Class suffered ascertainable loss and actual damages.

100.    Plaintiff Waldner and members of the proposed New York Class are entitled to all of the damages, remedies, fees, and costs available under NYDAPA, including but not limited to, injunctive relief, recovery of actual damages and/or fifty dollars in statutory damages, whichever is greater, as well as treble damages, reasonable attorneys' fees, and all other remedies this Court deems proper.

## SECOND CAUSE OF ACTION

**Violation of New York False Advertising Act ("NYFAA")**
**N.Y. GBL § 350,** *et seq.*
*(On Behalf of Plaintiff Waldner and the New York Class)*

101.    Plaintiff Waldner repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

102.    Plaintiff Waldner brings this claim individually and on behalf of the members of the proposed New York Class against Defendants for violations of NYFAA, N.Y. GEN. BUS. LAW § 350.

103.    The NYFAA makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." N.Y. GEN. BUS. LAW § 350. False advertising includes "advertising, including labeling of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of such representations [made] with respect to the commodity . . ." N.Y. GEN. BUS. LAW § 350(a).

104.    Defendants' routine of advertising discounted prices from false "reference" prices, which were never the prevailing market prices of those products and were materially greater than the true prevailing prices (i.e., Defendants' actual sale price), constitutes an unfair, untrue, and misleading practice. This deceptive marketing practice gave consumers the false impression that the products were regularly sold on the market for a substantially higher price than they actually

were; therefore, leading to the false impression that the products sold at Defendants' Ann Taylor Factory Store and LOFT Outlet stores were worth more than they actually were.

105.    Defendants intentionally and knowingly misled consumers by making untrue and misleading statements and failing to disclose material facts regarding the prices of their women's apparel and retail products with intent to mislead Plaintiff Waldner and members of the proposed New York Class.

106.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff Waldner and members of the proposed New York Class, about the price of their women's apparel and retail products. Plaintiff Waldner and members of the proposed New York Class reasonably relied upon Defendants' artificially inflated reference prices and false discounts when purchasing the women's apparel and retail products from Defendants' Ann Taylor Factory Store and LOFT Outlet stores. Plaintiff Waldner and members of the proposed New York Class would not have made such purchases but for Defendants' representations regarding the substantial discount being offered for the product.

107.    Defendants' violation of the NYFAA, through their unlawful, unfair, and fraudulent business practices, are ongoing and present a continuing threat that Plaintiff Waldner, members of the proposed New York Class, and the public will be deceived into purchasing products based on price comparisons of arbitrary and inflated "reference" prices and substantially discounted "sale" prices. These false comparisons created phantom markdowns and lead to financial damage for consumers like Plaintiff Waldner and members of the proposed New York Class.

108.    As a direct and proximate result of Defendants' misleading and false advertisements, as well as Defendants' deceptive and unfair acts and practices made during the course of Defendants' businesses, Plaintiff Waldner and members of the proposed New York Class suffered ascertainable loss and actual damages.

109.    Plaintiff Waldner and members of the proposed New York Class are entitled to all of the damages, remedies, fees, and costs available under NYFAA, including but not limited to,

injunctive relief, recovery of actual damages and/or five hundred dollars per violation, whichever is greater, as well as treble damages, reasonable attorneys' fees, and all other remedies this Court deems proper.

## THIRD CAUSE OF ACTION

**Violation of New Jersey Consumer Fraud Act ("NJCFA")**
**N.J.S.A. § 56:8-1, *et seq.***
***(On Behalf of Plaintiff Binder and the New Jersey Class)***

110.    Plaintiff Binder repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

111.    Plaintiff Binder brings this claim individually and on behalf of the members of the proposed New Jersey Class against Defendants for violations of NJCFA, N.J.S.A. § 56:8-1, *et seq.*

112.    The NJCFA applies to all sales made by Defendants in New Jersey.

113.    The NJCFA prohibits "unlawful practices," which are defined as: "[t]he act, use or employment of any unconscionable commercial practice, deception, fraud, false pretense, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission whether or not any person has in fact been misled, deceived, or damaged thereby." N.J.S.A. § 56:8-2. Defendants' conduct, as set forth herein, constitutes unlawful practices under this section.

114.    As stated by the New Jersey Supreme Court in *Lee v. Carter-Reed Co.*, *L.L.C.*, 4 A.3d 561, 580: "It bears repeating that the [NJCFA] does not require proof of reliance, but only a causal connection between the unlawful practice and ascertainable loss."

115.    The Appellate Division held in *Robey v. SPARC Group LLC*, 2023 WL 1828789, at *3 (App. Div. Feb. 9, 2023) that "the loss of discounts constitutes ascertainable losses" under the NJCFA.

116.    Defendants continuously advertised items for sale at purported "discounted" prices, which did not actually represent the advertised savings because the items were never offered for sale at their false reference prices for any substantial period of time. Therefore, when consumers,

including Plaintiff Binder and members of the proposed New Jersey Class, purchased those items at the "discounted" prices, they did not actually receive any discount.

117.   In the course of their businesses, Defendants advertised false reference prices that gave consumers, including Plaintiff Binder and members of the proposed New Jersey Class, the impression that their products were regularly sold for a substantially higher price, which lead to an artificial increase in consumers' demand and valuation for their products and further resulted in Defendants commanding an inflated price for the products. Both the inflated sale prices and the false reference prices for which Defendants advertised their products represented to consumers a higher value for Defendants' products than they were actually worth.

118.   Plaintiff Binder and members of the proposed New Jersey Class had no way of discerning that Defendants' representations were false and misleading.

119.   Defendants thus violated and continue to violate the NJCFA by making statements that, when considered as a whole from the perspective of a reasonable consumer, gave the false impression that the products sold by Defendants were worth more than their actual worth and were discounted.

120.   Defendants' uniform practices as alleged herein constitute unconscionable commercial practices relating to the sale of goods in violation of the NJCFA. § 56:8-1, *et seq.*

121.   Defendants' uniform practices also constitute "omission[s] of any material fact with intent that others rely upon such concealment," as Defendants did not inform Plaintiff Binder and members of the proposed New Jersey Class that the items they offered for sale at their stores were never actually offered for sale at their false reference prices for any substantial period of time and were not discounted whatsoever when they were purchased, or were discounted for an amount far less than the promised discount amount. Defendants intentionally omitted this information in order to induce customers to believe they would receive a discount on the items they purchased from Defendants according to the discount amount in Defendants' in-store advertisements.

122.    Defendants knew or should have known that their conduct violated NJCFA. Defendants owed a duty to Plaintiff Binder and members of the proposed New Jersey Class to refrain from engaging in deceptive acts, and to disclose the truth about their false discounts.

123.    Defendants intentionally and knowingly made affirmative misrepresentations and failed to disclose material facts regarding the prices of their apparel and other products with intent to mislead Plaintiff Binder and members of the proposed New Jersey Class.

124.    Defendants' misleading and false advertisements were material to Plaintiff Binder and members of the proposed New Jersey Class, as they relate to the price of the product the consumer is receiving and paying for. A reasonable consumer would attach importance to such representations and would be induced to act thereon in deciding whether or not to purchase the product.

125.    Defendants' deceptive acts and unconscionable commercial practices were likely to and did in fact deceive reasonable consumers, including Plaintiff Binder and members of the proposed New Jersey Class, about the price of their apparel and other products. Plaintiff Binder and members of the proposed New Jersey Class reasonably relied upon Defendants' false reference prices and false, artificially inflated discounts when purchasing the apparel and other products from Defendants' stores. Plaintiff Binder and members of the proposed New Jersey Class would not have made such purchases but for Defendants' representations regarding the substantial discount being offered for the product.

126.    Plaintiff Binder and members of the proposed New Jersey Class suffered an ascertainable loss within the meaning of the NJCFA as they did not receive the full benefit of the purported discounts Defendants offered when they purchased products from Defendants due to the promise of the discounts made by Defendants in their advertisements. The discounts promised by Defendants were illusory and as such Plaintiff Binder did not actually receive any discount in her purchases as alleged herein and, in actuality, paid an artificially inflated price for the merchandise beyond the price Defendants could have commanded for it in the absence of the false discounting scheme.

127.    As alleged herein, Defendants' conduct is a violation of both New Jersey and federal pricing regulations, and therefore, this conduct constitutes a per se violation of the NJCFA, N.J.S.A. § 56:8-1, *et seq.*

128.    Defendants' conduct alleged herein violates 16 C.F.R. § 233.1 because the purported "regular" reference prices in Defendants' outlet stores were "not bona fide but fictitious" under 16 C.F.R. § 233.1 because the items were not offered for sale or sold at the reference prices for any "reasonably substantial period of time." 16 C.F.R. § 233.1(a). Instead "an artificial, inflated price was established for the purpose of enabling the subsequent offer of a large reduction" by Defendants. *Id.*

129.    Likewise, Defendants' conduct alleged herein violates N.J.A.C. §§ 13:45A-9:3(a)(3) and 13:45A-9.4(a)(5) and (6) because for each of the items offered for sale by Defendants in their stores, Defendants failed to "[s]et forth the basis upon which the former price or price range or the amount of reduction in dollars was established in close proximity to the former price or price range of the advertised item," N.J.A.C § 13:45A-9.4(a)(5), and Defendants did not "[s]et forth with specificity when in the remote past a former price of an item of merchandise was effective." N.J.A.C § 13:45A-9.4(a)(6).

130.    Defendants' violation of NJCFA, through their unlawful, unfair, and fraudulent business practices, are ongoing and present a continuing threat that Plaintiff Binder, members of the proposed New Jersey Class, and the public will be deceived into purchasing products based on price comparisons of arbitrary and inflated "reference" prices and substantially discounted "sale" prices. These false comparisons created phantom markdowns and lead to financial damage for consumers like Plaintiff Binder and members of the proposed New Jersey Class.

131.    As a direct and proximate result of Defendants' misleading and false advertisements, as well as Defendants' deceptive acts and unconscionable commercial practices made during the course of Defendants' businesses, Plaintiff Binder and members of the proposed New Jersey Class suffered ascertainable loss and actual damages.

132.    Plaintiff Binder and members of the proposed New Jersey Class are entitled to all of the damages, remedies, fees, and costs available under NJCFA, including but not limited to, injunctive relief, recovery of actual damages, as well as treble damages, reasonable attorneys' fees, and all other remedies this Court deems proper.

## FOURTH CAUSE OF ACTION

**Violation of the New Jersey Truth in Consumer Contract, Warranty, and Notice Act ("TCCWNA")**
**N.J.S.A. § 56:12-14,** *et seq.*
*(On Behalf of Plaintiff Binder and the New Jersey Class)*

133.    Plaintiff Binder repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

134.    Plaintiff Binder brings this claim individually and on behalf of the members of the proposed New Jersey Class against Defendants for violations of TCCWNA, N.J.S.A. § 56:12-14.

135.    Plaintiff Binder and members of the proposed New Jersey Class are "consumers" within the meaning of N.J.S.A. §§ 56:12-15 and 16.

136.    Defendants are both a "seller" within the meaning of N.J.S.A. §§ 56:12-15 and 16.

137.    The advertisements and representations in Defendants' outlet stores regarding the former prices of items that state the items offered for sale are at discounted prices are a consumer "notice" and "warranty" within the meaning of N.J.S.A. §§ 56:12-15 and 16.

138.    The signs, notices, price tags, and other statements within Defendants' outlet stores are all a consumer "notice" and/or "sign" within the meaning of N.J.S.A. § 56:12-15.

139.    As alleged herein, in the course of their businesses, Defendants have violated N.J.S.A. § 56:12-16 because Defendants have offered written consumer notices and warranties to Plaintiff Binder and members of the proposed New Jersey Class, and these notices and warranties contained provisions which violated the established legal rights of Plaintiff Binder and members of the proposed New Jersey Class under both New Jersey state law and federal regulations, within the meaning of N.J.S.A. § 56:12-15.

140.    Plaintiff Binder and members of the proposed New Jersey Class are aggrieved consumers within the meaning of the TCCWNA because they suffered an adverse consequence as a result of purchasing Defendants' merchandise in that the discounts advertised by Defendants were illusory, thereby depriving New Jersey Class members of the benefit of the bargain and causing them to pay more for the merchandise than they would have in the absence of Defendants' false reference pricing scheme.

141.    As alleged herein, Defendants displayed signs and notices at their outlet stores presented to Plaintiff Binder and members of the proposed New Jersey Class, and these signs and notices violated their clearly established legal rights under 16 C.F.R. § 233.1 and N.J.A.C. §§ 13:45A-9.3(a)(3) and 13:45A-9.4(a)(5) and (6).

142.    As a direct and proximate result of Defendants' misleading and false advertisements made during the course of Defendants' businesses, Plaintiff Binder and members of the proposed New Jersey Class suffered ascertainable loss and actual damages.

143.    Plaintiff Binder and members of the proposed New Jersey Class are entitled to all of the damages, remedies, fees, and costs available under TCCWNA, including but not limited to, recovery of actual damages and a statutory penalty of one hundred dollars for each New Jersey Class member, as well as reasonable attorneys' fees, and all other remedies this Court deems proper.

## FIFTH CAUSE OF ACTION

### Violation of California's Unfair Competition Law ("UCL")
CAL. BUS. & PROF. CODE §§ 17200, *et seq.*
*(On behalf of Plaintiff Calcagno and the California Class)*

144.    Plaintiff Calcagno repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

145.    Plaintiff Calcagno brings this claim individually and on behalf of the members of the proposed California Class against Defendants for violations of the UCL, CAL. BUS. & PROF. CODE §§ 17200, *et seq.*

146.    The UCL defines "unfair business competition" to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. CAL. BUS. PROF. CODE § 17200.

147.    The UCL imposes strict liability. Plaintiff Calcagno and members of the proposed California Class need not prove that Defendants intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices—but only that such practices occurred.

***"Unfair" Prong***

148.    A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practice against the gravity of the harm to the alleged victims.

149.    Defendants' actions constitute "unfair" business practices because, as alleged above, Defendants engaged in misleading and deceptive price comparison advertising that represented false reference prices and corresponding deeply discounted phantom "sale" prices. Defendants' acts and practices offended an established public policy of transparency in pricing, and constituted immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

150.    The harm to Plaintiff Calcagno and members of the proposed California Class outweighs the utility of Defendants' practices because Defendants' practice of advertising false discounts provides no utility. There were reasonably available alternatives to further Defendants' legitimate business interests other than the misleading and deceptive conduct described herein.

***"Fraudulent" Prong***

151.    A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

152.    Defendants' acts and practices alleged above constitute fraudulent business acts or practices as they have deceived Plaintiff Calcagno and members of the proposed California Class and are highly likely to deceive members of the consuming public. Plaintiff Calcagno, and

members of the proposed California Class relied on Defendants' fraudulent and deceptive representations regarding their false or outdated "original prices" for products sold by Defendants at their Ann Taylor Factory Store and LOFT Outlet stores. These misrepresentations played a substantial role in Plaintiff Calcagno's and members of the proposed California Class's decision to purchase the product at a purportedly steep discount, and Plaintiff Calcagno and members of the proposed California Class would not have purchased the product without Defendants' misrepresentations.

### *"Unlawful" Prong*

153.    A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

154.    Defendants' act and practices alleged above constitute unlawful business acts or practices as they have violated state and federal law in connection with their deceptive pricing scheme. The FTCA prohibits "unfair or deceptive acts or practices in or affecting commerce" (15 U.S.C. § 45(a)(1)) and prohibits the dissemination of any false advertisements. 15 U.S.C. § 52(a). Under the FTC, false former pricing schemes, like Defendants', are described as deceptive practices that would violate the FTCA:

> (a) One of the most commonly used forms of bargain advertising is to offer a reduction from the advertiser's own former price for an article. If the former price is the actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time, it provides a legitimate basis for the advertising of a price comparison. Where the former price is genuine, the bargain being advertised is a true one. If, on the other hand, the former price being advertised is not bona fide but fictitious - *for example, where an artificial, inflated price was established for the purpose of enabling the subsequent offer of a large reduction - the "bargain" being advertised is a false one*; the purchaser is not receiving the unusual value he expects. In such a case, the "reduced" price is, in reality, probably just the seller's regular price

> (b) A former price is not necessarily fictitious merely because no sales at the advertised price were made. The advertiser should be especially careful, however, in such a case, that the price is one at which the product was openly and actively offered for sale, for a reasonably substantial period of time, in the recent, regular course of his business, honestly and in good faith - and, of course, not for the purpose of establishing a fictitious higher price on which a deceptive comparison might be based. And the advertiser should scrupulously avoid any implication that a former price is a selling, not an asking price (for example, by use of such language as, "Formerly sold at $_____"), unless substantial sales at that price were actually made.

16 C.F.R. § 233.1(a) and (b) (emphasis added).

155.    In addition to federal law, California law also expressly prohibits false former pricing schemes. The FAL, Cal. Bus. & Prof. Code § 17501, entitled "*Worth or value; statements as to former price*," states:

> For the purpose of this article the worth or value of any thing advertised is the prevailing market price, wholesale if the offer is at wholesale, retail if the offer is at retail, at the time of publication of such advertisement in the locality wherein the advertisement is published.
>
> ***No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement*** or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement.

Cal. Bus. & Prof. Code § 17501 (emphasis added).

156.    As detailed in Plaintiffs' Seventh Cause of Action below, the CLRA, Cal. Civ. Code § 1770(a)(9), prohibits a business from "[a]dvertising goods or services with intent not to sell them as advertised," and subsection (a)(13) prohibits a business from "[m]aking false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions."

157.    As detailed herein, the acts and practices alleged were intended to or did result in violations of the FTCA, the FAL, and the CLRA.

158.    Defendants' practices, as set forth above, misled Plaintiff Calcagno, the proposed California Class, and the public in the past and will continue to mislead in the future. Consequently, Defendants' practices constitute an unlawful, fraudulent, and unfair business practice within the meaning of the UCL.

159.    Defendants' violations of the UCL, through their unlawful, unfair, and fraudulent business practices, are ongoing and present a continuing threat that members of the proposed California Class and the public will be deceived into purchasing products based on price comparisons of arbitrary and inflated "reference" prices and substantially discounted "sale" prices. These false comparisons created phantom markdowns and lead to financial damage for consumers like Plaintiff Calcagno and the members of the proposed California Class.

160.    Pursuant to the UCL, Plaintiff Calcagno and members of the proposed California Class are entitled to preliminary and permanent injunctive relief enjoining Defendants from further engagement in this unfair competition, as well as disgorgement and restitution to Plaintiff Calcagno and the proposed California Class of all Defendants' revenues wrongfully obtained from them as a result of Defendants' unfair competition, or such portion of those revenues as the Court may find equitable.

## SIXTH CAUSE OF ACTION

### Violation of California's False Advertising Law ("FAL")
### CAL. BUS. & PROF. CODE §§ 17500, *et seq.*
### *(On behalf of Plaintiff Calcagno and the California Class)*

161.    Plaintiff Calcagno repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

162.    Plaintiff Calcagno brings this claim individually and on behalf of the members of the proposed California Class against Defendants for violations of California's FAL, CAL. BUS. & PROF. CODE §§ 17500, *et seq*.

163.    CAL. BUS. & PROF. CODE § 17500 provides:

It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of . . . personal property or to perform services, professional or otherwise, or anything of any nature whatsoever or to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement, concerning that . . . personal property or those services . . . . which is ***untrue or misleading***, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading . . .

(Emphasis added).

164.    The "intent" required by section 17500 is the intent to make or disseminate personal property (or cause such personal property to be made or disseminated), and not the intent to mislead the public in the making or dissemination of such property.

165.    Similarly, this section provides, "no price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price … within

three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly, and conspicuously stated in the advertisement." CAL BUS. & PROF. CODE § 17501.

166.    Defendants' routine of advertising discounted prices from false "reference" prices, which were never the prevailing market prices of those products and were materially greater than the true prevailing prices (i.e., Defendants' actual sale price), constitutes an unfair, untrue, and misleading practice. This deceptive marketing practice gave consumers the false impression that the products were regularly sold on the market for a substantially higher price than they actually were; therefore, leading to the false impression that the products sold at Defendants' Ann Taylor Factory Store and LOFT Outlet stores were worth more than they actually were.

167.    Defendants misled consumers by making untrue and misleading statements and failing to disclose what is required as stated in the Code alleged above.

168.    As a direct and proximate result of Defendants' misleading and false advertisements, as well as Defendants' deceptive and unfair acts and practices made during the course of Defendants' businesses, Plaintiff Calcagno and members of the proposed California Class suffered ascertainable loss and actual damages.

169.    Plaintiff Calcagno and members of the proposed California Class request that this Court order Defendants to restore this money to Plaintiff Calcagno and the proposed California Class, and to enjoin Defendants from continuing these unfair practices in violation of the FAL in the future. Otherwise, Plaintiff Calcagno, members of the proposed California Class, and the broader general public, will be irreparably harmed and/or denied an effective and complete remedy.

## SEVENTH CAUSE OF ACTION

**Violation of California's Consumers Legal Remedies Act ("CLRA")**
**CAL. CIV. CODE § 1750, *et seq.***
***(On behalf of Plaintiff Calcagno and the California Class)***

170.    Plaintiff Calcagno repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

171.    Plaintiff Calcagno brings this claim individually and on behalf of the members of the proposed California Class against Defendants for violations of California's CLRA, CAL. CIV. CODE § 1750, *et seq.*

172.    Plaintiff Calcagno and each member of the proposed California Class are "consumers" as defined by CAL. CIV. CODE § 1761(d). Defendants' sale of products at their Ann Taylor Factory Store and LOFT Outlet stores were "transactions" within the meaning of CAL. CIV. CODE § 1761(e). The products purchased by Plaintiff Calcagno and members of the proposed California Class are "goods" or "services" within the meaning of CAL. CIV. CODE §§ 1761(a) - (b).

173.    Defendants violated and continue to violate the CLRA by engaging in the following practices proscribed by CAL. CIV. CODE § 1770(a) in transactions with Plaintiff Calcagno and members of the proposed California Class which were intended to result in, and did result in, the sale of products sold at their Ann Taylor Factory Store and LOFT Outlet stores:

a.    advertising goods or services with intent not to sell them as advertised; § 1770(a)(9); and

b.    making false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions; § 1770(a)(13).

174.    On May 10, 2023, Plaintiff Calcagno, through counsel, sent a CLRA demand letter to Defendants that provided notice of Defendants' violation of the CLRA and demanded Defendants correct, repair, replace, or otherwise rectify the unlawful, unfair, false, and deceptive practices complained of herein. The letter also stated that if Defendants refused to do so, Plaintiff Calcagno would file a complaint seeking damages in accordance with the CLRA. If Defendants

do not respond to Plaintiff Calcagno's letter or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days of the date of written notice pursuant to § 1782, Plaintiff Calcagno will amend the complaint to seek actual, punitive, and statutory damages, as appropriate against Defendants.

175.    Attached hereto as **Exhibit B** is a declaration of venue pursuant to CAL. CIV. CODE §1780(d).

## VI.    PRAYER FOR RELIEF

Wherefore, Plaintiffs, on behalf of themselves and on behalf of the other members of the Classes, requests that this Court award relief against Defendants as follows:

a.    an order certifying the Classes and designating Plaintiffs as the Class Representatives and their counsel as Class Counsel;

b.    awarding restitution and disgorgement of all profits and unjust enrichment that Defendants obtained from Plaintiffs and the Class members as a result of their unlawful, unfair, and fraudulent business practices described herein;

c.    awarding declaratory and injunctive relief as permitted by law or equity, including: enjoining Defendants from continuing the unlawful practices as set forth herein, and directing Defendants to identify, with Court supervision, victims of their misconduct and pay them all money they are required to pay;

d.    awarding actual, punitive and statutory damages as permitted under the New Jersey Consumer Fraud Act and the New Jersey Truth in Consumer Contract, Warranty, and Notice Act;

e.    awarding actual, punitive and statutory damages as permitted under the New York False Advertising Act and New York Consumer Protection from Deceptive Acts and Practices Act;

f.    ordering Defendants to engage in a corrective advertising campaign;

g.    awarding attorneys' fees and costs; and

h.    for such other and further relief as the Court may deem necessary or appropriate.

## VIII.   DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all of the claims so triable.

Dated: May 10, 2023

**LYNCH CARPENTER LLP**

By:  */s/ Gary F. Lynch*

Gary F. Lynch (NY 5553854)
gary@lcllp.com
1133 Penn Ave., 5th Floor
Pittsburgh, PA 15222
Telephone:    412.322.9243

**LYNCH CARPENTER LLP**

Todd D. Carpenter (*pro hac vice* forthcoming)
todd@lcllp.com
Scott G. Braden (*pro hac vice* forthcoming)
scott@lcllp.com
1350 Columbia Street, Ste. 603
San Diego, California 92101
Telephone:    619.762.1910
Facsimile:    619.756.6991

*Attorneys for Plaintiffs and*
*Proposed Class Counsel*