UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
DEMETRA BINDER, on behalf of
themselves and all others similarly
situated, ANGELA WALDNER, on behalf
of themselves and all others similarly
situated, and CHRISTINA CALCAGNO,
on behalf of themselves and all others
similarly situated,

                Plaintiffs,

       - against -

PREMIUM BRANDS OPCO LLC, an Ohio
Limited Liability Company,

                Defendant.
-----------------------------------X

**MEMORANDUM AND ORDER**

23 Civ. 3939 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

     This case, like many other "outlet store" cases that have been filed in federal court in recent years, challenges defendant's alleged practice of pricing its products in a way that misleads buyers into believing that they are getting a steep discount on products when, in fact, there is no discount at all.  Here, three individual plaintiffs ("plaintiffs") commenced this putative class action against defendant Premium Brands Opco LLC ("defendant"), which owns and operates Ann Taylor Factory Store and LOFT Outlet stores (the "Outlet Stores").  Plaintiffs purchased items from Outlet Stores in New York, New Jersey, and California allegedly based on the belief that those items were subject to substantial markdowns from an allegedly false "original" or "reference" price.

Plaintiffs assert claims under New York, New Jersey, and California law and seek both damages and injunctive relief. Defendant has, in turn, moved to dismiss plaintiff's claims. For the following reasons, the Court (1) grants defendant's motion to dismiss under Rule 12(b)(1) for lack of standing to seek injunctive relief; (2) grants defendant's Rule 12(b)(6) motion to dismiss the claims brought under New York and New Jersey law; and (3) denies the motion as to the claims brought under California law.

**BACKGROUND**

**A.   Factual Background[1]**

The three named plaintiffs in this action include New Jersey residents Demetra Binder ("Binder") and Angela Waldner ("Waldner"), as well as California resident Christina Calcagno ("Calcagno").  SAC ¶¶ 46-57.  Defendant sells women's apparel, shoes, and accessories at its Outlet Stores.[2]  Id. ¶ 1.

According to the operative complaint, each individual plaintiff purchased one or more items from an Outlet Store in

---

[1] The following facts, taken from the Second Amended Complaint ("SAC", ECF No. 24), are assumed to be true for the purposes of this motion.  See Kalnit v. Eichler, 264 F.3d 131, 135 (2d Cir. 2001).

[2] Defendant also operates Ann Taylor and LOFT "mainline" retail stores (i.e., non-outlet stores), but those stores are not the subject of plaintiffs' complaint.  See SAC ¶ 1 n.2.

either New York, New Jersey, or California.[3]  Id. ¶¶ 46, 50, 54.
Before purchasing these items, plaintiffs allegedly "noticed
numerous signs" in the Outlet Stores advertising various
percentage off ("___% Off") discounts on items throughout the
store.  Id. ¶¶ 47-55.  Indeed, as alleged, every item that
plaintiffs purchased was marked down from an "original price,"
causing them to believe they were "getting a significant bargain
on the merchandise."  Id. ¶¶ 48, 52, 56.

However, plaintiffs allege that these steep discounts are
"nothing more than phantom markdowns" because the (1) the "original
prices" are "artificially inflated," (2) the products are rarely,
if ever, offered for sale at the "original price," and (3) the
original prices "are never the true market price for the
products."[4]  Id. ¶ 14.  Thus, in plaintiffs' view, this pricing

---

[3] Specifically, Binder purchased six products ranging from $11.50 to $59.49 at
an Outlet Store in New Jersey on May 7, 2022. SAC ¶ 46. Waldner purchased a
single item for $56.24 from a LOFT Outlet in New York on August 29, 2022.  Id.
¶ 50. Calcagno similarly bought a single product for $32.99 from an Ann Taylor
Factory Store in California on January 18, 2022.  Id. ¶ 54.
[4] Prior to bringing this lawsuit, plaintiffs' counsel conducted what it calls
"a large-scale, comprehensive investigation into the [d]efendant's pricing
practice."  SAC ¶ 39.  As part of this investigation, which ran from October
2021 to September 2022, plaintiffs' investigators visited Ann Taylor Factory
Store and LOFT Outlet stores in New York, New Jersey, and California "nearly
every day" to verify the prices being offered on the Outlet Store merchandise.
Id. ¶¶ 39, 43.  According to plaintiffs, the investigation revealed that
"hundreds of items" sold by defendant, including those products purchased by
plaintiffs, "remained continuously discounted from their 'original' or 'price
tag' price" and were not offered for sale at their original price.  Id. ¶ 40.
For example, "[a]s far back as October 2, 2021, all types of blouses and tops
were offered at a discount that compared a regular price ($64.99, $59.99,

scheme "has the effect of depriving consumers of the benefit of their bargain" as it "is merely a basis for misleading consumers into believing they are receiving a substantial discount from the false original price." Id. ¶ 18. Without these markdowns, plaintiffs claim that they would not have purchased the items they did. Id. ¶¶ 49, 53, 57.

In addition to being deceived into purchasing the items based on the fictitious markdowns, plaintiffs allege that the pricing scheme caused them to pay an inflated price -- or, a "price premium" -- for the merchandise. Id. ¶¶ 49, 53, 57, 58-71. By using false "original" prices, plaintiffs claim that defendant is able to command an artificially inflated "sale" price, which itself is significantly higher than the good is actually worth. See id. ¶¶ 58-71. Although plaintiffs acknowledge that there is "no regular or market price for many of the products being sold at [the Outlet Stores] other than the price set by [d]efendant at those stores," id. ¶ 19 (emphasis omitted), plaintiffs claim that they employed experts who were "able to determine the objective

---

$49.99) to a percentage-off discount ('40% off') in [the Outlet Stores]." Id. ¶ 41. In other words, as plaintiffs tell it, the investigation found that "all items had price tags that were . . . perpetually 'discounted' by in-store signage indicating a large percentage off . . . or whole-price reduction discount." Id. ¶ 43.

measure by which [p]laintiffs . . . overpaid for the goods they purchased," id. ¶ 64.

Based on these allegations, plaintiffs assert, on behalf of themselves and others similarly situated, violations of (1) New York Consumer Protection from Deceptive Acts and Practices Act and New York False Advertising Act (collectively, the "New York Claims"); (2) New Jersey Consumer Fraud Act and New Jersey Truth in Consumer Contract, Warranty, and Notice Act (collectively, the "New Jersey Claims"); and (3) California's Unfair Competition Law, False Advertising Law, and Consumer Legal Remedies Act (collectively, the "California Claims").   Id. ¶¶ 88-177.   As mentioned above, plaintiffs seek, among other things, damages as well as injunctive relief.

## B.   Procedural History

Plaintiffs commenced this putative class action on May 10, 2023, ECF No. 1, and filed a first amended complaint on May 30, 2023, ECF No. 7.[5]  On August 4, 2023, defendant filed a pre-motion letter regarding its anticipated motion to dismiss the first amended complaint, to which plaintiffs responded on August 9, 2023.

---

[5] Plaintiffs initially asserted claims against several other named defendants but subsequently withdrew their claims against those defendants.

ECF Nos. 22-23.  On August 11, 2023, the Court determined that defendant could bring its motion without the necessity of a pre-motion conference but granted plaintiffs leave to file a second amended complaint.  ECF No. 23.  Accordingly, on August 25, 2023, plaintiffs filed the Second Amended Complaint.  ECF No. 24.

On October 27, 2023, defendant filed its motion to dismiss the Second Amended Complaint.  ECF No. 30-32.  Plaintiffs filed their opposition to the motion on December 1, 2023, ECF Nos. 33-34, and defendant filed a reply in further support of its motion on December 21, 2023, ECF No. 35.  Additionally, on March 28, 2024, defendant filed a notice of supplemental authority to which plaintiffs did not respond.  ECF No. 36.

## LEGAL STANDARD

Defendant seeks to dismiss plaintiffs' Second Amended Complaint on the following grounds: (1) lack of subject matter jurisdiction pursuant to the Federal Rule of Civil Procedure 12(b)(1) on the basis that plaintiffs lack standing to seek injunctive relief,[6] and (2) failure to state a claim upon which

---

[6] While defendant does not specifically mention Rule 12(b)(1), we construe its argument that plaintiffs lack standing to seek injunctive relief as a motion for lack of subject matter jurisdiction pursuant to Rule 12(b)(1).  See Dean v. Town of Hempstead, 527 F. Supp. 347, 365 n.3 (E.D.N.Y. 2021); Buonasera v. Honest Co., 208 F. Supp. 3d 555, 559 (S.D.N.Y. 2016).

relief may be granted pursuant to Rule 12(b)(6) as to all of plaintiffs' substantive state law claims.

**A. Rule 12(b)(1)**

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). To survive a motion to dismiss for lack of subject-matter jurisdiction based on standing pursuant to Rule 12(b)(1), the plaintiff "must allege facts that affirmatively and plausibly suggest that it has standing to sue." Amidax Trading Grp. v. S.W.I.F.T. SCRL, 671 F.3d 140, 145 (2d Cir. 2011). Where the defendant places jurisdictional facts in dispute, the court may properly consider "evidence relevant to the jurisdictional question [that] is before the court." Robinson v. Gov't of Malaysia, 269 F.3d 133, 140 (2d Cir. 2001). However, if "the defendant challenges only the legal sufficiency of the jurisdictional allegations, the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff." Id. (internal citation omitted).

**B.     Rule 12(b)(6)**

To survive a motion to dismiss under Rule 12(b)(6), a complaint must include "enough facts to state a claim that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  A court must accept as true all factual allegations in the complaint and draw all reasonable inferences in plaintiff's favor.  Acticon AG v. China N.E. Petrol. Holdings Ltd., 692 F.3d 34, 37 (2d Cir. 2012).  In evaluating the sufficiency of a complaint, "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."  DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010).

<u>DISCUSSION</u>

**A. Standing**

At the outset, the Court addresses the "threshold question" of whether plaintiffs have constitutional standing to bring their claims.  Denney v. Deutsche Bank AG, 443 F.3d 253, 263 (2d Cir.

-8-

2006).  Defendant argues that plaintiffs lack Article III standing to seek injunctive relief for failure to plausibly allege the type of "future injury" necessary to establish such standing.  ECF No. 31 ("Mot.") at 23-25.  The Court agrees and dismisses plaintiffs' claims to the extent they seek injunctive relief.

A plaintiff "must demonstrate standing separately for each form of relief sought."  Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 185 (2000).  To seek injunctive relief, a plaintiff "must show the three familiar elements of standing: injury in fact, causation, and redressability."  Cacchillo v. Insmed, Inc., 638 F.3d 401, 404 (2d Cir. 2011).  To satisfy the injury requirement when seeking injunctive relief, "a plaintiff cannot rely on a past injury alone."  Buonasera v. Honest Co., 208 F. Supp. 3d 555, 564 (S.D.N.Y. 2016).  Instead, a plaintiff must establish a "real or immediate threat of injury," or, in other words, "that she is likely to be harmed again in the future in a similar way."  Nicosia v. Amazon.com, Inc., 834 F.3d 220, 239 (2d Cir. 2016) (emphasis added) (quotations omitted).  "The Supreme Court has repeatedly reiterated that threatened injury must be certainly impending to constitute injury in fact, and that allegations of possible future injury are not sufficient."  Am. C.L. Union v. Clapper, 785 F.3d

787, 800 (2d Cir. 2015) (emphases in original) (quotations omitted).

"That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured." Lewis v. Casey, 518 U.S. 343, 357 (1996) (quotations omitted). Thus, "[f]or each claim asserted in a class action, there must be at least one class representative (a named plaintiff or a lead plaintiff) with standing to assert that claim." Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co., 862 F. Supp. 2d 322, 331 (S.D.N.Y. 2012).

In this specific context, where plaintiffs are aware of the allegedly deceptive pricing practices that they challenge, it undercuts any inference that they will be deceived by those practices again in the future.  For example, in Marino v. Coach, Inc., 264 F. Supp. 3d 558 (S.D.N.Y. 2017), plaintiffs alleged that they were deceived into believing that defendant's "Manufacturer's Suggested Retail Price" (or "MSRP") were prices at which the outlet store goods were "previously offered for sale."  Id. at 563.  The court concluded that plaintiffs lacked standing to seek injunctive relief because "[e]ven if they had" alleged that they "intend[ed] to purchase products from Coach Factory stores in the future,"

"now that they know that the [MSRPs] are not former prices, they cannot be misled." <u>Id.</u> at 565.  Instead, as the court explained, plaintiffs' claim for injunctive relief was "based entirely on their past injuries and the potential that other consumers might be deceived in the future."  <u>Id.</u>

Courts have routinely reached a similar conclusion in the generally similar but still distinct context of defective product or product mislabeling cases.  Last year, for example, this Court held that consumers, who claimed they were misled by the deceptive labeling of defendant's energy bar, lacked standing to seek injunctive relief because, even if they had alleged a desire to purchase the energy bar in the future, "there would be no likelihood that plaintiffs would subject themselves to future injury by repurchasing defendant's allegedly deceptive products now that they are aware of the true product contents." <u>Seljak v. Pervine Foods, LLC</u>, No. 21 Civ. 9561 (NRB), 2023 WL 2354976, at *6 (S.D.N.Y. Mar. 3, 2023).  In reaching this conclusion, the Court was merely following a long line of similar cases rejecting claims for injunctive relief where the plaintiffs necessarily became aware of the allegedly deceptive labels or defective products. <u>See, e.g.,</u> <u>Alce v. Wise Foods, Inc.</u>, No. 17 Civ. 2402 (NRB), 2018 WL 1737750, at *6 (S.D.N.Y. Mar. 27, 2018) ("Consumers who were

misled by deceptive food labels lack standing for injunctive relief because there is no danger that they will be misled in the future."); Davis v. Hain Celestial Grp., Inc., 297 F. Supp. 3d 327, 339 (E.D.N.Y. 2018) ("To the extent that plaintiff was deceived by defendants' products, he is now aware of the truth and will not be harmed again in the same way . . . [he] therefore lacks standing to seek an injunction."); Elkind v. Revlon Consumer Prods. Corp., No. 14 Civ. 2484 (JS)(AKT), 2015 WL 2344134, at *3 (E.D.N.Y. Mar. 14, 2015) ("Plaintiffs are now aware of the alleged misrepresentations that they challenge, so there is no danger that they will again be deceived by them.").

Here, plaintiffs' knowledge of defendant's allegedly deceptive pricing practices belies any plausible claim that they will likely be deceived by defendant's pricing practices in the future. Plaintiffs assert that they were, at the time they purchased items from the Outlet Stores, "misled" and "deceived" by defendant's alleged pricing practices. SAC ¶¶ 63, 83. However, plaintiffs currently acknowledge that they are well-aware of the supposed "truth about [defendant's] advertised discount prices and former reference prices." Id. ¶ 75. While plaintiffs claim a desire to shop at and purchase items from the Outlet Stores again in the future, their admitted knowledge of defendant's pricing

practices renders implausible their allegation that they "may again" be misled "under the reasonable, but mistaken impression that the advertised reference price represented a <u>bona fide</u> former price at which the item was previously offered for sale."  <u>Id.</u> ¶¶ 70-71.  Put simply, plaintiffs themselves are aware of the very deception they challenge, and therefore there is no danger that they will be misled again in the future.  Thus, as in <u>Marino</u>, plaintiffs' claim for injunctive relief is "based entirely on their past injuries and the potential that other consumers might be deceived in the future."  <u>Marino</u>, 264 F. Supp. 3d at 565.  While the possible deception of <u>other</u> consumers is a reasonable concern, it is not a basis to establish standing for <u>these</u> named plaintiffs.

Plaintiffs attempt to plead around this outcome by alleging that they are "not knowledgeable about [d]efendant's pricing practices with regards to its apparel items that have not yet been offered for sale at [the Outlet Stores]."  SAC ¶ 71.  However, this allegation is equally as implausible as those discussed above.  Plaintiffs maintain in this case that defendant's use false reference prices as a means to entice consumers, and therefore, if plaintiffs return to the Outlet Stores in the future, they will presumably understand what it means when defendant advertises some percentage off an "original price," regardless of which

hypothetical future item is offered for sale.  As long as defendant continues using the very same pricing practice at issue in this case, plaintiffs cannot plausibly say that they will be "harmed again in the same way" no matter what product defendant is selling. Davis, 297 F. Supp. 3d at 339.

The Court also rejects plaintiffs' invitation to follow the reasoning in the defective products case Morales v. Kimberly-Clark Corp., 18 Civ. 7401 (NSR), 2020 WL 2766050 (S.D.N.Y. May 27, 2020). See ECF No. 33 ("Opp.") at 22-23.  In that case, plaintiff alleged that she would be willing to purchase defendant's product again "if she were assured that any purported defects were identified and eliminated." Morales, 2020 WL 2766050, at *5.  The court found that such allegations were sufficient for plaintiff to establish her standing to seek injunctive relief because "to hold otherwise would effectively neuter any attempt at seeking class-wide injunctive relief" under New York's consumer protection statute. Id. (quotations omitted).  In reaching this conclusion, the court was following other decisions which have effectively carved out a "public policy exception" in consumer protection cases to the constitutional standing requirement of a future continuing injury. Indeed, the court in Morales expressly relied on Belfiore v. Procter & Gamble Co., 94 F. Supp. 3d 440 (E.D.N.Y. 2015), in which

the court held that "[p]ublic policy, as well as precedent, support
the rule that Article III standing exists to seek injunctive relief
[because] [t]o hold otherwise would denigrate the New York consumer
protection statute, designed as a major support of consumers who
claim to have been cheated." Id. at 445-46; see also Henderson v.
Gruma Corp., 2011 WL 1362188, at *8 (C.D. Cal. Apr. 11, 2011)
(preventing plaintiffs from seeking injunctive relief would
"surely thwart the objective of California's consumer protection
laws").

The Court certainly understands the intention behind these
decisions and recognizes that it is a curious result to prevent a
plaintiff from enjoining a practice that may run afoul of state
consumer protection laws. However, the Supreme Court has made
clear that "standing in federal court is a question of federal
law, not state law." Hollingsworth v. Perry, 570 U.S. 693, 715
(2013). Thus, in assessing a plaintiff's standing, we must set
aside the question of "whether the purposes of the state law would
be furthered by permitting plaintiffs to seek injunctive relief."
Marino, 264 F. Supp. 3d at 566. Once we do that, the result
becomes clear: "Article III does not permit [the] sort of public
policy exception" made in Morales and relied upon by plaintiffs
here. In re Avon Anti-Aging Skincare Creams & Prods. Mktg. & Sales

<u>Practices Litig.</u>, No. 13 Civ. 150 (JPO), 2015 WL 5730022, at *8
(S.D.N.Y. Sept. 30, 2015).  Though we acknowledge that rejecting
this exception and precluding plaintiffs from seeking injunctive
relief may stand in direct tension with the worthy objectives of
the state consumer protection statutes under which plaintiffs
bring suit, we are bound chiefly by the Constitution, which
invariably requires plaintiffs to demonstrate future injury.
Accordingly, because plaintiffs have not established a threat of
future injury, they lack standing to seek injunctive relief.[7]

**B. Statutory Claims**

Having addressed plaintiffs' lack of standing to seek
injunctive relief, we turn now to their substantive state law
claims.  As discussed above, plaintiffs assert three sets of state
law claims: (1) New York Claims; (2) New Jersey Claims; and (3)
California Claims.  Given the distinct nature of these state law
claims, the Court will address each set of claims in turn.

---

[7] Our holding in this respect, however, does not prevent government authorities
from seeking injunctive relief under the relevant statutes.  <u>See, e.g.</u>, N.Y.
Gen. Bus. L. § 349(b); N.J.S.A. 56:8-8; Cal. Bus. & Prof. §§ 17203-04.

1. **New York Claims**

Plaintiffs' New York Claims allege violations of the New York Consumer Protection from Deceptive Acts and Practices Act ("NYDAPA"), N.Y. Gen. Bus. L. § 349, and the New York False Advertising Act ("NYFAA"), N.Y. Gen. Bus. L. § 350.[8]  "To state a claim under either section, a plaintiff must plead facts to show that (1) the challenged transaction was consumer-oriented; (2) defendant engaged in deceptive or materially misleading acts or practices; and (3) plaintiff was injured by reason of defendant's deceptive or misleading conduct."  Izquierdo v. Panera Bread Co., 450 F. Supp. 3d 453, 461 (S.D.N.Y. 2020) (quotations omitted); see also Wurtzburger v. Kentucky Fried Chicken, No. 16 Civ. 8186 (NSR), 2017 WL 6416296, at *2 (S.D.N.Y. Dec. 13, 2017) ("A claim of false advertising under GBL § 350 [NYFAA] must meet all of the same elements as a claim under GBL § 349 [NYDAPA].").

Defendant's motion to dismiss is focused on the third element: whether plaintiffs sufficiently pled injury.  Mot. at 5-13.  In

---

[8] The NYDAPA prohibits any "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York]." N.Y. Gen. Bus. L. § 349(a).  The NYFAA prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in [New York]."  Id. § 350.  "False advertising" encompasses "advertising, including labeling, of a commodity, . . . if [it] is misleading in a material respect."  Id. § 350-a(1).  These New York Claims are not subject to the heightened pleading standards set forth in Federal Rule of Civil Procedure 9(b). See Garcia v. Chrysler Grp. LLC, 127 F. Supp. 3d 212, 239 (S.D.N.Y. 2015).

-17-

their Second Amended Complaint, plaintiffs allege that Waldner, the sole named plaintiff who purchased an item from Outlet Stores in New York, suffered two distinct injuries in making that purchase.  First, Waldner alleges that she was deceived into thinking she was "getting a significant bargain" and "would not have made her purchase" absent defendant's deception.  SAC ¶¶ 52-53.  Second, Waldner claims that she was injured because she paid an "inflated price" or "price premium" for the item.  Id. ¶ 53.  However, in their opposition brief, plaintiffs appear to abandon their first theory of injury and focus exclusively on the second -- the price premium theory.  Opp. at 5-14.  This is understandable.  As will be discussed, of the two theories plaintiffs initially alleged, only the price premium theory has been recognized as cognizable in this context.  Even still, plaintiffs do not and cannot establish a price premium theory of injury and for that reason, their New York Claims fail.

As noted above, the NYDAPA and NYFAA both require plaintiffs to plead and prove actual injury.  To plead actual injury under either statute, "a plaintiff must allege that, on account of a materially misleading practice, she purchased a product and did not receive the full value of her purchase." Orlander v. Staples, Inc., 802 F.3d 289, 302 (2d Cir. 2015).  One way to demonstrate

-18-

this is to allege a "price premium" injury: that the misrepresentation caused plaintiff to overpay for a product. <u>See</u> <u>id.</u> Critically, however, New York law does not recognize "an injury based on [a defendant's] deception itself -- the fact that [p]laintiff was deceived is not, standing alone, an 'actual injury.'" <u>Belcastro v. Burberry Ltd.</u>, No. 16 Civ. 1080 (VEC), 2017 WL 744596, at *3 (S.D.N.Y. Feb. 13, 2017) ("<u>Burberry I</u>"). In other words, to establish actual injury under New York law, a plaintiff must plead "something more" than just the defendant's deception. <u>Preira v. Bancorp Bank</u>, 885 F. Supp. 2d 672, 677 (S.D.N.Y. 2012).

The oft-cited case, <u>Small v. Lorillard Tobacco Co., Inc.</u>, 94 N.Y.2d 43 (1999), helps flesh out the difference between "actual injury" and a non-cognizable injury based solely on the deception itself. In <u>Small</u>, a putative class of plaintiffs claimed that they would not have purchased defendants' cigarettes but for defendants' deceptive conduct in concealing the addictive nature of cigarettes. <u>Id.</u> at 50-51. However, plaintiffs did not "allege that the cost of cigarettes was affected by the alleged misrepresentations." <u>Id.</u> at 56. Nor did they "seek recovery for injury to their health as a result of their ensuing addiction." <u>Id.</u> Instead, the crux of plaintiffs' claim was that the "deception

prevented them from making free and informed choices as consumers."
Id.   That is, plaintiffs would not have purchased the cigarettes
but for defendants' deceptive practices.   Id.   In rejecting
plaintiffs' "deception as injury" theory, the New York Court of
Appeals reasoned that "[w]ithout addiction as part of the injury
claim, there is no connection between the misrepresentation and
any harm from, or failure of, the product."   Id.

In the wake of Small, "courts applying New York law have
consistently recognized that [there must] be a connection between
the defendant's deception and an objective injury."   Burberry I,
2017 WL 744596, at *4.   It is for this reason that plaintiffs'
first theory of injury -- that Waldner "would not have made her
purchase without the misrepresentations made by [d]efendant" --
fails to establish actual injury.   SAC ¶ 53.   As one court
explained, "New York law does not recognize an injury based on the
subjective value assigned to a missing bargain" because it
"impermissibly combines the deception (the appearance of a
bargain) with injury (there was no actual bargain)."   Belcastro v.
Burberry Ltd., No. 16 Civ. 1080 (VEC), 2017 WL 5991782, at *3-4
(S.D.N.Y. Dec. 1, 2017) ("Burberry II").   Indeed, courts in this
District have repeatedly rejected the very theory of injury alleged
by plaintiffs in other outlet store cases, where, as here, a

plaintiff believed she was getting a bargain based on a fictitious "original price" and seeks compensation for her subjective disappointment upon discovering that there was never any bargain at all.  See, e.g., DaCorta v. AM Retail Grp., Inc., No. 16 Civ. 1748 (NSR), 2018 WL 557909, at *8 (S.D.N.Y. Jan. 23, 2018) ("It is clear that Plaintiff believes she was deceived into purchasing the product and spending what she did, but that fails to demonstrate an actual injury required under the law."); Irvine v. Kate Spade & Co., 16 Civ. 7300 (JMF), 2017 WL 4326538, at *4 (S.D.N.Y. Sept. 28, 2017) (holding that the assertion that "but for the mistaken belief that they were getting a bargain, Plaintiffs would not have made their purchases at all[,] is squarely foreclosed by Small"); Burberry I, 2017 WL 744596, at *4-6 (rejecting plaintiff's theory of injury based on his belief that "he was getting a terrific bargain on his purchases . . . [when] [i]n reality, he was not getting a bargain at all").

Plaintiffs here seem well-aware of the foregoing case law, which helps explain why they retreat from their subjective disappointment theory of injury and put all their eggs into the "price premium" basket.  Opp. at 4-12.  Unlike the so-called "but-I-thought-I-got-a-bargain" theory of injury, the price premium theory has been deemed cognizable by courts applying New York law.

-21-

As discussed above, a price premium injury exists when a misrepresentation causes a plaintiff to overpay for a product.[9] To properly allege a price premium injury, plaintiff must show "either that because of a misrepresentation the plaintiff received a good worth less than what he paid for, i.e., a good of inferior quality, or that because of a misrepresentation the plaintiff paid an inflated price." Burberry II, 2017 WL 5991782, at *4. Although these two theories are nearly indistinguishable, id. at *4 n.3, plaintiffs appear to rely only on the latter -- the "overpayment" theory, rather than the "inferior quality" theory, see SAC ¶ 61; Opp. at 11. To establish an overpayment price premium theory, "a plaintiff must allege that he overpaid by some objective measure, and not just that he felt, subjectively, that he overpaid." Burberry II, 2017 WL 5991782, at *4 (emphasis added); see also Shaulis v. Nordstrom, Inc., 865 F.3d 1, 12 (1st Cir. 2017) ("[C]laims of injury premised on 'overpayment' for a product . . . require an objective measure against which the plaintiff's allegations may be evaluated.").

---

[9] That this is a recognized form of injury makes good sense in light of Small because where a plaintiff overpays as a result of a misrepresentation, there is a clear "connection between the defendant's deception and an objective injury." Burberry I, 2017 WL 744596, at *4.

Although this is a viable theory of injury, plaintiffs in similar outlet store cases have struggled to muster the factual allegations necessary to show, in an objective sense, how exactly they overpaid for the items they purchased.   In <u>DaCorta</u>, for example, the plaintiff sued an outlet store after purchasing a pair of boots with an original price of $180.00 and "sale" price of $44.99.   <u>DaCorta</u>, 2018 WL 557909, at *2.   The plaintiff attempted to plead a price premium theory of injury by "simply alleging the word 'premium,'" but the court rebuffed her efforts, finding that "[w]ithout allegations as to the value, or the unique quality for which the premium was paid, there can be no connection between the misrepresentation and the harm from the product."  <u>Id.</u> at *8 (emphasis omitted); <u>see also</u> <u>id.</u> at *9 ("In the absence of such allegations reflecting the . . . value of the product and how it failed to live up to its marketing, Plaintiff cannot draw the requisite connection between deception and harm.").

The court in <u>Kate Spade</u> rejected similar efforts.   In that case, the plaintiffs alleged, in relevant part, that they "would have paid less than they did" but for the defendant outlet store's allegedly deceptive pricing practices.   <u>Kate Spade</u>, 2017 WL 4326538, at *4.   In rejecting this theory of injury, the court explained that the plaintiff's complaint lacked any allegation

that would support a cognizable overpayment price premium injury,
explaining:

> In the absence of the latter sort of allegation -- for
> instance, that Kate Spade sells the same merchandise, <u>without</u>
> the deceptive "Our Price" labeling, for a lower price --
> Plaintiffs cannot connect any cognizable injury to Kate
> Spade's alleged deceptive practice.   In other words,
> Plaintiffs do not, and cannot, establish a valid "price
> premium" claim based solely on the "Our Price" tags, as they
> do not allege that the tagged goods commanded a higher price
> than goods without the tag.

<u>Id.</u> (emphasis in original);[10] <u>see also</u> <u>Burberry II</u>, 2017 WL 5991782,
at *4 (rejecting overpayment price premium theory because
plaintiff "d[id] not allege that he purchased products that
normally retail for less than he actually paid").

Plaintiffs clearly recognize the challenges presented by the
existing case law and try mightily to overcome those hurdles.  For
example, by arguing that there is "a causal relationship" between
defendant's "false pricing scheme and [plaintiffs'] corresponding
overpayment," Opp. at 9, plaintiffs here do more than those in

---

[10] In <u>Kate Spade</u>, the court accepted plaintiffs' alternative theory of injury
that plaintiffs were misled about the quality of the outlet store products,
namely, that they believed they were purchasing non-outlet products at a
discount.  <u>See</u> 2017 WL 4326538, at *4-5.  Here, however, plaintiffs do not
assert that they were misled about the quality of the products or that they
believed they were purchasing non-outlet products at a discount.  <u>See</u> SAC ¶ 19
(acknowledging that the Outlet Stores "carry mostly -- if not entirely -- made-
for-outlet merchandise" and that "all made-for-outlet [Outlet Store]
merchandise can be differentiated from mainline retail Ann Taylor merchandise
by the inclusion of the word 'Factory' [or 'Outlet'] on its labels and/or price
tags").

DaCorta and Kate Spade who made nothing more than conclusory allegations about "overpaying" for outlet store goods.  However, the fundamental question remains: have plaintiffs advanced the factual allegations necessary to support an inference that they "overpaid by some _objective_ measure"?  Burberry II, 2017 WL 5991782, at *4 (emphasis added).  Stated otherwise, have plaintiffs shown that the discounted sale prices were inflated above some _objective_ value of the items?  On this dispositive question, despite their efforts, plaintiffs still fall short of establishing a baseline market price of the products against which to measure the alleged overpayment.

First, plaintiffs rely heavily on "qualified expert economists and consultants" who plaintiffs claim were "able to determine the objective measure by which [p]laintiffs . . . overpaid for the goods they purchased."  SAC ¶ 64.  Specifically, according to plaintiffs, these experts used the data collected during the investigation, see supra n.4, to analyze 122 products offered for sale in defendant's stores during the class periods, SAC ¶ 65.  The average sale price within the data sample was $45.63, whereas the average reference price was $81.66, meaning that, on average, the reference price was $36.03 higher than the ultimate sale price.  Id.  Using this data, plaintiffs' experts

are alleged to have performed two regression models,[11] which, together, supposedly suggest that "increasing the reference price by $1 results in an increase of at least approximately $0.7 in the selling price of items at Ann Taylor." Id. ¶ 66. According to plaintiffs, these regression results, combined with the $36.03 price differential, "impl[y] that selling prices were $25.78 higher, on average" due to defendant's pricing scheme. Id. ¶ 67. As such, in plaintiffs' view, these amount to "objective measures" demonstrating that plaintiffs overpaid for the items they purchased. Id. ¶ 69.

Even in the light most favorable to plaintiffs, the Court does not see how their analysis actually provides any insight as to the true market value of defendant's products. As plaintiffs themselves explain, consistent with the guidance provided by DaCorta and Kate Spade, the "objective measure" of defendant's alleged overcharge is the difference between the sale price with the reference price and the "market sale price that the products would have commanded without [d]efendant's [alleged] deception." Id. However, plaintiffs' analysis simply does not measure this

---

[11] As alleged, the models include (1) a simple regression analysis to statistically estimate the relationship between the selling price and reference price, finding a regression coefficient of 0.7156; and (2) a model adding additional control variables for specific product characteristic, finding a regression coefficient of 0.7299. SAC ¶ 66.

difference.  Indeed, even a cursory glance at its methodology reveals that the analysis only examines the relationship between defendant's reference and sale prices.  See id. ¶¶ 65-66.  Thus, while the analysis may be able to establish an unsurprising correlation between these prices -- that as reference prices are increased, so too are sale prices -- it clearly cannot establish the type of causal relationship plaintiffs claim it does: that sale prices were increased <u>because</u> of an increase in the reference prices.  In short, plaintiffs' analysis says nothing about the real market value of defendant's products or the price those products would have sold for absent the allegedly false reference price.[12]  Accordingly, contrary to plaintiffs' contention, their experts' analysis does not provide an "objective measure by which [p]laintiffs were overcharged."  Id. ¶ 69.

Second, plaintiffs extensively cite academic studies, which they contend support the notion that defendant uses reference

---

[12] We also note that plaintiffs allege that "there is no regular or market price for many of the products being sold at [the Outlet Stores] other than the price set by [d]efendant at those stores."  SAC ¶ 19 (emphasis omitted).  Because this directly undercuts the argument that there is some market value for the items sold at the Outlet Stores, plaintiffs attempt to walk back this allegation in their opposition brief.  See Opp. at 6.  Specifically, plaintiffs clarify that the "lack of 'regular market price' simply means that [d]efendant's exclusive made-for-outlet items are not sold anywhere else."  Id. at 6 n.6.  We accept plaintiffs' clarification but recognize that there is some perhaps large kernel of truth in their initial allegation: establishing a true market price for exclusively made products may present significant, if not insurmountable, challenges in most cases.

prices to inflate sale prices.  See id. ¶¶ 10-13, 35-36.  However, like plaintiffs' regression analysis, these studies do not prove nearly as much as plaintiffs claim they do.  Taken together, these studies dress in more academic garb the simple premise that perceived bargains pique consumer interest and thus may increase demand for a given product.[13]  See id.  But this rather obvious insight does not compel the conclusion, which plaintiffs urge us to draw, that retailers like defendant use increased demand to inflate their sale prices above some objective market value.

What plaintiffs' theory fails to acknowledge is that there are myriad factors that may influence defendant's pricing, especially for discretionary purchases in a competitive market like the one at issue here.  For example, if defendant was inflating its sale prices to a level greater than what the market would bear, defendant would risk losing sales to competing retailers, likely located in the same outlet malls.[14]  In this sense, retailers like defendant actually have a strong incentive

---

[13] Notably, the academic studies underlying plaintiffs' theory say nothing of the pricing practices employed by defendant specifically, which considerably limits their persuasive value here.  Nor do the studies address any other well-recognized factors that may affect pricing, such as competition in the relevant market.

[14] Additionally, under plaintiffs' conception of pricing, there is theoretically no limit to what a retailer could charge for its merchandise as long as it continues to raise its reference prices.  This belies the reality that individuals have a ceiling on the prices they are willing to pay for basic clothing items, even if it means foregoing a perceived bargain.

<u>not</u> to increase sale prices above some real market value of their merchandise.  At bottom, plaintiffs' theory based on the academic studies is simply too speculative for the Court to accept, even at this stage.  These studies may support the basic precept that the use of reference prices increases aggregate consumer demand, but they do not sustain plaintiffs' position that retailers employing reference prices <u>must</u> use this increased demand to artificially inflate their sale prices, and they certainly do not support the inference that <u>defendant's</u> selling prices, in particular, are so inflated.

Finally, in attempting to establish an objective market value of defendant's goods, plaintiffs rely on, in both their complaint and briefing, numerous price premium cases involving an inferior quality theory of injury.  <u>See</u> SAC ¶ 38 n.25; Opp. at 6-8.  However, as noted, this is a distinct (albeit slightly) theory of injury that makes these cases wholly inapt.  In those cases, a product is marketed as having a unique quality, which allows the company to charge a premium for the product.  Plaintiff pays that premium and learns that the product does not have the unique quality it was marketed as having.  A quintessential example of this theory is found in <u>Ebin v. Kangadis Food</u>, 13 Civ. 2311 (JSR), 2013 WL 6504547 (S.D.N.Y. Dec. 11, 2013), a case plaintiffs cite, in which

consumers alleged a cognizable injury after they had a paid a premium for the defendant's product, labeled "100% Pure Olive Oil," and the product turned out to contain "olive-pomace oil" (i.e., not pure olive oil).  <u>Id.</u> at *4-5.  Here, plaintiffs do not claim that the products they purchased from the Outlet Stores lacked some unique quality that they were marketed as having or that they were otherwise of an inferior quality.  Therefore, these cases lend no support to plaintiffs' position, and accordingly, we conclude that plaintiffs fail to assert a cognizable price premium theory of injury.

Plaintiffs suggest that such a result means that "<u>no</u> outlet false discounting case could ever be sustained on the pleadings in the Second Circuit no matter how robust the allegations," Opp. at 10, but the Court does not believe the consequences of our holding are so dire.  For one thing, as should be clear from the above, plaintiffs in outlet store cases can still allege that they were misled about the inferior quality of the goods they purchased. <u>See, e.g.</u>, <u>Kate Spade</u>, 2017 WL 4326538, at *4-5 (rejecting overpayment price premium theory but accepting inferior quality theory).  After all, this is "[t]ypically" how consumers overpay for goods and thus sustain a price premium theory of injury. <u>Burberry II</u>, 2017 WL 5991782, at *4 n.3.  But even in the specific

context of an overpayment price premium theory case, a plaintiff could demonstrate an objective market value by alleging that the products she purchased due to false reference prices were previously (or are simultaneously) sold at lower prices without the use of reference prices.  Alternatively, a future plaintiff presumably could allege that similar quality products from other retailers were sold without reference prices and routinely cost less.  However, plaintiffs have not alleged these types of facts, and without them, they have not plausibly alleged an "objective" measure of the value of the purchased products as is required to state an overpayment price premium injury.

For these reasons, plaintiffs have not stated a cognizable injury under New York law and therefore we dismiss their New York Claims.

## 2. New Jersey Claims

We turn next to plaintiffs' claimed violations of New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. §§ 56:8-1 to -227,[15] and New

---

[15] The NJCFA prohibits the use of "unconscionable or abusive" commercial practices, as well as "deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that other rely" thereon.  N.J.S.A. 56:8-2.  The New Jersey Supreme Court has interpreted the NJCFA to "protect against three forms of unlawful practices: knowing misrepresentations, omissions of material fact, and violations of administrative regulations."  Robey v. SPARC Grp. LLC, 256 N.J. 541, 554-55 (2024) (quotations omitted).  Relevant here, the "[u]se of a

Jersey Truth in Consumer Contract, Warranty, and Notice Act ("TCCWNA"), N.J.S.A. §§ 56:12-14 to -18.[16]   While there is substantial overlap between the two statutes, we address them separately, beginning with the NJCFA before turning to the TCCWNA.

### a. NJCFA

To state a claim under the NJCFA, a plaintiff must plead, among other things, "an ascertainable loss." Robey v. SPARC Grp. LLC, 256 N.J. 541, 555 (2024). Although the statute does not define "ascertainable loss," the Supreme Court of New Jersey has interpreted that to mean the consumer's loss must be "quantifiable or measurable, not hypothetical or illusory." Id. (quotations omitted). Ascertainable loss can be established by demonstrating either (1) an "out-of-pocket loss" or (2) a "deprivation of the benefit of one's bargain." Id. at 548. "Out-of-pocket damages represent the difference between the price paid and the actual value received, while benefit-of-the-bargain principles allow recovery for the difference between the price paid and the value

_____

fictitious former price" violates N.J.A.C. 13:45A-9.6(a), a regulation promulgated under the NJCFA, "and is therefore made unlawful by the statute." Id. at 555.

[16] The TCCWNA "did not create new legal rights but sought to require sellers to acknowledge already existing 'clearly established consumer rights' by providing new remedies for violations of those rights." Robey, 256 N.J. at 563.   In relevant part, the TCCWNA provides a cause of action "through which consumers aggrieved by means of a proscribed practice may seek recovery." Id. at 564.

of the property had the representations been true." Id.
(quotations omitted). Plaintiffs seem to claim that Binder, the
named plaintiff who purchased items from a New Jersey Outlet Store,
suffered both out-of-pocket losses and was deprived the benefit of
her bargain. See SAC ¶¶ 47-49. But regardless of which theory of
ascertainable loss plaintiffs rely upon, the Supreme Court of New
Jersey's recent decision in Robey entirely forecloses plaintiffs'
NJCFA claim.

Plaintiffs in Robey brought a putative class action against
the owner and operator of Aéropostale based on similar allegations
to those here: that the items they purchased "on sale" from the
Aéropostale are never in fact offered at the "original" or
reference prices listed on the price tag, thereby rendering the
advertised "markdowns" illusory. Robey, 256 N.J. at 547-50. While
the trial court granted defendant's motion to dismiss for
plaintiffs' failure to establish "ascertainable loss," an
intermediate appellate court reversed, holding that "the loss
of . . . discounts constitutes ascertainable losses" under the
NJCFA. Robey v. SPARC Grp. LLC, 474 N.J. Super. 593, 602 (App.
Div. 2023), rev'd, 256 N.J. 541 (2024).

The intermediate appellate court's decision was the state of
the law at the time plaintiffs in this case filed their Second

Amended Complaint and when the parties were briefing the instant motion to dismiss.  Unsurprisingly then, plaintiffs' operative complaint and briefing both rely almost exclusively on the Appellate Division's holding in Robey to sustain their theory of ascertainable loss.  However, on March 25, 2024, while this motion was pending, the Supreme Court of New Jersey reversed the Appellate Division's holding, prompting defendant to file a notice of supplemental authority to which plaintiffs notably did not respond.  See ECF No. 36.

The Supreme Court of New Jersey ruled in Robey that the plaintiffs had failed to plead sufficient facts to establish an ascertainable loss under either of the two available theories. 256 N.J. at 560.  First, the plaintiffs could not show "out-of-pocket loss" because they did not allege that "the products they purchased were worthless or unsuitable for their intended use, or that they have spent or will spend additional funds following their purchases to make the items usable for their intended purpose." Id.  Second, the plaintiffs failed to establish that they were denied "the benefit of their bargain" because they did not "allege that the items purchased were materially different from what was promised" nor did they allege "any dissatisfaction with or defects in the items purchased."  Id. at 560-61.

Robey is controlling and precludes plaintiffs' claims under New Jersey law.  To begin, plaintiffs clearly cannot establish out-of-pocket losses.  As in Robey, there are no allegations that the products plaintiffs purchased "were worthless or unsuitable for their intended use." Id. at 560.  Notably, as in Robey, while "plaintiffs allege that they never would have purchased the items," they "do not claim that they attempted to return the items to [the Outlet Stores] or that [defendant] refused to accept such a return." Id.  This was determinative in Robey, and likewise here.  Accordingly, plaintiffs fail to plead an out-of-pocket theory of ascertainable loss.

Plaintiffs' ascertainable loss theory based on the deprivation of the benefit of the bargain presents a closer call but ultimately fails for reasons similar to those in Robey.  In rejecting the benefit of the bargain theory, the Robey Court explained that "the goods plaintiffs received are exactly what they knowingly purchased -- functioning and usable pants, sweatshirts, and t-shirts.  Indeed, plaintiffs do not argue that the items were worth less than the amount they paid." Id. at 562.  Plaintiffs here similarly do not argue that the items they purchased were somehow defective or otherwise were not precisely what they "knowingly purchased" when they selected the items in-

person at the Outlet Stores.   However, in contrast to Robey,
plaintiffs here attempt to allege that the value of the goods was
objectively lower than what they paid, even after receiving the
discounts reflected in the sale prices.   As detailed above,
however, the Court is not convinced that plaintiffs have plausibly
alleged that the sale prices were in fact artificially inflated
above some lower objective market price.   Therefore, despite their
best efforts, plaintiffs here, just like those in Robey, have not
shown that they "purchased and received clothing that was . . .
worth less than the amount they paid."  Id. at 561-62.

Furthermore, the Court in Robey noted that its holding on the
benefit-of-the-bargain theory of loss was consistent with "the
majority of decisions by other state and federal courts that have
addressed whether plaintiffs suffered a cognizable injury as a
result of deceptive pricing under various state consumer
protection laws."  Id. at 562 (citing cases).   The most recent of
those cited cases -- a decision from the United States Court of
Appeals for the Eighth Circuit -- presents particular challenges
for plaintiffs' benefit of the bargain theory.   In that case,
Hennessey v. Gap, Inc., 86 F.4th 823 (8th Cir. 2023), the court
was faced with similar allegations as here, including that "the
actual fair market value of each item at the time of her

purchase . . . may have even been less than the discounted prices she paid." Id. at 826. In rejecting plaintiffs' theory of ascertainable loss, the Eighth Circuit explained (and the Robey Court quoted) that "in cases where plaintiff was fraudulently induced to purchase a product that was no different in quality than defendant represented at the time of sale, . . . there is no ascertainable loss under [Missouri law] because the price paid was both the represented value and the value of the product plaintiff received." Id. at 828. Of course, Hennessey involved distinct Missouri state law, but this basic principle remains highly instructive, especially in light of Robey's reliance on it: where, as here, there is no claim that the quality of the product was inferior, the ultimate sale price and the real market value of the product are one in the same. This reasoning only lends further support for our conclusion that plaintiffs failed to establish some "objective" market value for which defendant's items would have sold without the allegedly fictitious reference prices. For these reasons, plaintiffs have not alleged ascertainable loss and thus their NJCFA claim fails.

### b. TCCWNA

We now turn to plaintiffs' claim under New Jersey Truth in Consumer Contract, Warranty, and Notice Act. To state a claim

under the TCCWNA, plaintiffs must establish, in relevant part, that they are "aggrieved consumers," which has been defined as a consumer who "suffered adverse consequences as a result of the defendant's regulatory violation." Robey, 256 N.J. at 564.  In Robey, the court held that "[b]ecause . . . plaintiffs have not incurred an ascertainable loss of money or property due to the violation of the fictious former pricing regulation, N.J.A.C. 13:45A-9.6(a), plaintiffs are not monetarily aggrieved for purposes of TCCWNA under the facts pled." Id.  We have no reason to deviate from this reasoning, and therefore we find that plaintiffs' TCCWNA claim necessarily fails for the same reasons their NJCFA claim fails.

### 3. California Claims

Finally, we consider plaintiffs' California Claims, which allege violations of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200-10, False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500-09, and Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750-84.

The UCL prohibits any "unlawful, unfair, or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.  The FAL prohibits any "unfair, deceptive, untrue, or misleading

advertising." Cal. Bus. & Prof. Code § 17500. "[A]ny violation of the [FAL] . . . necessarily violates the [UCL]." <u>Williams v. Gerber Prods. Co.</u>, 552 F.3d 934, 938 (9th Cir. 2008) (quotations omitted). Last, California's CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices." Cal. Civ. Code § 1770. "Under these California statutes, conduct is deceptive or misleading if it is likely to deceive an ordinary consumer." <u>Dennis v. Ralph Lauren Corp.</u>, 2016 WL 7387356, at *4 (S.D. Cal. Dec. 20, 2016) (citing <u>Williams</u>, 552 F.3d at 938).

Because claims under each of these statutes sound in fraud, Calcagno, the named plaintiff for the California Claims, must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). <u>See</u> <u>Lisner v. Sparc Grp. LLC</u>, 2021 WL 6284158, at *3 (C.D. Cal. Dec. 29, 2021) (citing <u>Bly-Magee v. California</u>, 236 F.3d 1014, 1018 (9th Cir. 2001)). "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Accordingly, "a pleading must identify the who, what, when, where, and how of the misconduct charged, and how of the misconduct charges, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false." <u>Davidson v. Kimberly-Clark Corp.</u>, 889 F.3d 956, 964 (9th Cir. 2018)

(quotations omitted).  In this context specifically, plaintiff must "allege sufficient facts to show with particularity how or why displaying the [reference] price" was false or deceptive. Sperling v. DSWC, Inc., 699 F. App'x 654, 655 (9th Cir. 2017). Here, defendant's sole argument for dismissal of plaintiffs' California Claims is that Calcagno fails to state those claims "with particularity" as required under Rule 9(b).  Mot. at 18-23. For the following reasons, we disagree and deny defendant's motion to dismiss as to the California Claims.

As an initial matter, plaintiffs argue that the Court should apply a "relaxed" Rule 9(b) standard because information about defendant's internal pricing practices and data is exclusively within defendant's possession and control.  Opp. at 20-21.  At present, "the Ninth Circuit has yet to definitively address the level of factual detail necessary pursuant to Rule 9(b) to sufficiently plead fraud claims under the UCL, FAL, and CLRA." Lisner, 2021 WL 6284158, at *4.  Indeed, the Ninth Circuit reached essentially divergent conclusions on this very question in two non-published opinions.  In Sperling, the Ninth Circuit affirmed the dismissal of a complaint where plaintiff "failed to allege sufficient facts to show with particularity how or why displaying the . . . 'compare at' price was false or deceptive."  699 F. App'x

at 655 (emphasis added).  By contrast, in Rubenstein v. Neiman
Marcus Group LLC, the court reversed the dismissal of a complaint
because "the particular facts as to whether the Compared To prices
are fictitious are likely only known to [defendant]" and therefore
plaintiff "need not specifically plead facts to which she cannot
reasonably be expected to have access."  687 F. App'x 564, 568
(9th Cir. 2017) (quotations omitted).  In the wake of Sperling and
Rubenstein, "district courts have reached different conclusions
and outcomes regarding whether plaintiffs must allege a pre-suit
investigation and/or the level of factual detail required in cases
alleging deceptive pricing practices."  Lisner, 2021 WL 6284158,
at *4.

        Of these cases, Lisner is most directly on point and instructs
us not to apply a relaxed Rule 9(b) standard.  In Lisner, the court
did not apply such a standard because the complaint "demonstrate[d]
that not all information regarding [defendant's] pricing practices
[was] held exclusively by [d]efendant."  Lisner, 2021 WL 6284158,
at *5 (emphasis added).  To the contrary, plaintiffs argued that
their pre-suit investigation into defendant's retail stores and
website was "extensive and sufficient to demonstrate a nationwide
fraud scheme."  Id.  Because plaintiffs were attempting to use
their allegations regarding defendant's pricing practices "as both

a sword and a shield," the court refused to apply a relaxed Rule 9(b) standard.   Id.

Here, plaintiffs similarly conducted a pre-suit investigation into defendant's pricing practices.   See supra n.4.   Perhaps in an attempt to distinguish Lisner, plaintiffs stop short of arguing that their investigation definitively reveals a nationwide scheme, and instead they clarify that the investigation is only "meant to serve as a preliminary demonstration" of such a scheme.   Opp. at 20 (emphasis in original).   Yet, like those in Lisner, plaintiffs here characterize their investigation as "extensive," id. at 19, and argue that it reveals defendant's, "systematic," "pervasive," and "uniform" use of false reference prices at all of its locations, SAC ¶¶ 39-40; see also id. ¶ 39 ("Plaintiffs' counsel has conducted a large-scale, comprehensive investigation into the [d]efendant's pricing practice.").   Therefore, as in Lisner, plaintiffs cannot use their pre-suit investigation "as both a sword and shield" and thus we reject plaintiffs' request to employ a relaxed Rule 9(b) standard.

Nonetheless, plaintiffs have alleged sufficient facts to satisfy the particularity standard of Rule 9(b).   To start, plaintiffs adequately "identify the who, what, when, where, and how of the misconduct charged."   Davidson, 889 F.3d at 964.

-42-

According to plaintiffs, on January 18, 2022 (the "when"), Calcagno (the "who") went shopping at an Ann Taylor Factory Store in San Diego, California that plaintiffs call the "Las Americas Outlet" (the "where").  SAC ¶ 54.  There, Calcagno noticed and relied upon "numerous signs" advertising certain percentage off discounts on items throughout the store, leading her to purchase the item "M Knits 32509076" for $32.99, marked down from the allegedly "false reference price" of $54.99 (the "what").  Id. ¶¶ 54-55.  Plaintiffs also allege that the reference price misled Calcagno and other "reasonable consumer[s] [who] would have interpreted the false advertised reference price . . . as a representation of former prices at which [d]efendant recently sold the item and would again soon" (the "how").  Id. ¶ 56.  Courts, including the Ninth Circuit, have found similar allegations to be sufficient to identify the "who, what, when, where, and how" of the purported misconduct.  See, e.g., Nunez v. Saks Inc., 771 F. App'x 401, 403 (9th Cir. 2019); Safransky v. Fossil Grp., 2018 WL 1726620, at *10-12 (S.D. Cal. Apr. 9, 2018); Stathakos v. Columbia Sportswear Co., 2016 WL 1730001, at *4 (N.D. Cal. May 2, 2016).

Additionally, allegations stemming from plaintiffs' pre-suit investigation are sufficient to demonstrate "with particularity how or why displaying the [reference] price" was false or

deceptive.  <u>Sperling</u>, 699 F. App'x at 655.  The operative complaint explains that as part of the investigation, which began in October 2021 and concluded in September 2022, investigators observed Outlet Stores "throughout California, New Jersey, and New York," including the Las Americas Outlet where Calcagno purchased an item, "nearly every day to verify the prices being offered on the [Outlet Store] merchandise."  SAC ¶¶ 39, 43.  The investigators allegedly found that "[e]very product in [the Outlet Stores] remained on sale for the duration of this tracking period, discounted against a false reference price."  <u>Id.</u> ¶ 39.  To support this, plaintiffs attach to their complaint a sample of the information they collected on eighteen of defendant's products, including a photograph, description, reference price, and respective markdowns on October 2, 2021 and September 14, 2022 -- markdowns that were essentially the same on those two dates, nearly one year apart.  <u>See</u> ECF No. 24-3 ("Ex. C").  For example, "The Straight – Curvy Fit" pants had a reference price of $98.99, but according to the investigation, defendant offered those pants "40% off" on both October 2, 2021 and again on September 14, 2022.  <u>Id.</u> at 4.  A similar pattern is largely reflected in the seventeen other items contained in the exhibit.[17]  <u>See</u> <u>id.</u> at 1-5.  At this stage, these

_____

[17] Plaintiffs also attach two exhibits containing photographs of price tags and SKU numbers observed during the investigation, as well as various photographs

pre-suit investigation allegations are sufficient to state a claim under the FAL, UCL, and CLRA.  See Dennis v. Ralph Lauren Corp., 2017 WL 3732103, at *4-5 (S.D. Cal. Aug. 29, 2017) (finding complaint sufficient where it included "a chart detailing the particular items that were included in the investigation, the particular stores where those items were offered for sale, the advertised 'Our Price' price for each item, the advertised discount for each item, and the dates on which the prices were recorded and verified").

To resist this conclusion, defendant advances several arguments, none of which are persuasive.  First, defendant attempts to discredit plaintiffs' pre-suit investigation on the basis that it did not track the specific items plaintiffs purchased.  Mot. at 19-21.  While that appears to be true, plaintiffs' investigation was nonetheless sufficiently detailed to establish, with sufficient particularity, a broader pattern in defendant's pricing practices -- a pattern into which Calcagno's purchased item fit neatly.  Indeed, as discussed above, plaintiffs' investigation revealed that numerous items sold by defendant essentially remained on perpetual sale over the course of a year, marked down

---

of the in-store discount signs plaintiffs describe.  See ECF Nos. 24-1 ("Ex. A"), 24-2 ("Ex. B").

from substantially higher reference prices.  Plaintiffs further allege that the specific items they purchased, including the item Calcagno purchased in the Las Americas Outlet, were subject to a steep discount, at least on the day they purchased those items. SAC ¶¶ 54-55.  Based on these allegations, it is entirely reasonable to conclude that plaintiffs' particular items were subject to the same pricing practices that defendant applied to the numerous other items included in plaintiffs' pre-suit investigation, and therefore we reject defendant's first argument. See Dahlin v. Under Armour, 2020 WL 6647733, at *4 (C.D. Cal. July 31, 2020) ("Although [p]laintiff's counsel's investigation apparently did not track the specific garments [p]laintiff purchased, the [c]omplaint nevertheless alleges sufficient facts about a uniform course of conduct to plausibly support a conclusion that the same allegedly fraudulent practices applied to the items [p]laintiff purchased.").

Second, defendant faults plaintiffs for failing to allege the "original pricing of [p]laintiffs' own purchased products when they were first offered in the Outlet Stores." Mot. at 19.  Only this allegation, defendant argues, would be sufficient to support plaintiff's assertion that the "original" price was "never" the true market price at the Outlet Stores.  Id. (quoting SAC ¶ 40).

-46-

However, as explained in <u>Lisner</u> -- a case defendant otherwise cites extensively -- plaintiffs "are not required to allege the full daily detailed pricing histories of the products purchased." <u>Lisner</u>, 2021 WL 6284158, at *5 (quotations omitted).  To hold otherwise would place unrealistic demands on plaintiffs because information regarding the release date of new products is information that is uniquely within defendant's control.  While, in theory, there is limitless information plaintiff could collect about defendant's pricing practices, such as the price at which a product is first offered, in practice, there are limits to what a plaintiff can be reasonably expected to provide at the outset of litigation in this context.  Plaintiffs' investigation has already revealed that the discounts offered on numerous items were identical or nearly identical on two dates roughly one year apart from each other, which, in combination with plaintiffs' other allegations, have sufficiently established, at this early stage, a pattern of deceptive markdowns without the need for allegations about the "original pricing" of Calcagno's own purchased products or of any other products for that matter.

Third, defendant attempts to liken plaintiffs' pre-suit investigation allegations to those in <u>Lisner</u>.  Mot. at 21.  In <u>Lisner</u>, the court found plaintiffs' complaint insufficient because

it identified "only [the pricing history for] three specific
items," none of which were the items purchased by plaintiffs.  2021
WL 6284158, at *6.  Here, by contrast, plaintiffs identify the
precise item Calcagno purchased and provide the exact pricing
information for that item (at least on the day it was purchased).
SAC ¶¶ 54-57.  Moreover, plaintiffs investigated and tracked
numerous items -- at least eighteen but perhaps even 122 -- to
establish the deceptive pricing scheme they allege.  See SAC ¶ 65;
Ex. C.  Therefore, contrary to defendant's contention, Lisner is
distinguishable and our conclusion regarding the California Claims
remains: we find that plaintiffs have stated claims under the UCL,
FAL, and CLRA, and therefore we deny defendant's motion to dismiss
as to the California Claims.

## CONCLUSION

For the foregoing reasons, defendant's motion to dismiss is
granted in part and denied in part.  Specifically, defendant's
motion is granted insofar as (1) plaintiffs do not have standing
to seek injunctive relief on their claims; and (2) plaintiffs' New
York Claims and New Jersey Claims are dismissed.  However,
defendant's motion to dismiss is denied as to the California
Claims, which are the only remaining claims.  The Clerk of Court

is respectfully directed to terminate the motion pending at ECF No. 30.

        **SO ORDERED.**

Dated:     June 11, 2024
            New York, New York

                            NAOMI REICE BUCHWALD
                        UNITED STATES DISTRICT JUDGE